(C.D. 4666)

SCHMIDT, PRITCHARD & Co.; INC.⎫
FERROQUIP CORP.⎬ *v.* UNITED STATES

Court No. 67/77399

Port of New York

(Decided August 5, 1976)

*Barnes, Richardson & Colburn (Richard C. King* of counsel) for the plaintiffs.
*Rex E. Lee,* Assistant Attorney General (*John J. Mahon,* trial attorney), for the defendant.

NEWMAN, Judge: In this protest, the parties agree there is no genuine issue as to any material fact, and have filed cross-motions for summary judgment pursuant to rule 8.2.

For the reasons stated herein, plaintiffs' motion is granted.

The issue for determination concerns the proper tariff classification for certain wire rod coiling equipment [1] imported from West Germany in 1965 through the port of New York. Duty was assessed at the rate of 15 per centum ad valorem pursuant to the provision in item 674.35, TSUS, for "Other" metal-working machine tools. Plaintiffs claim that the proper rate of duty is 10 per centum ad valorem pursuant to the provision in item 678.50, TSUS, for machines not specially provided for, and parts thereof.

---

[1] The subject merchandise is invoiced as "Combination Garrett/Edenborn Reels".

(1)

2

Tariff Schedules of the United States, 19 USC 1202:

### SCHEDULE 6. – METALS AND METAL PRODUCTS

\*    \*    \*    \*    \*    \*    \*

### PART 4. – MACHINERY AND MACHINERY EQUIPMENT

\*    \*    \*    \*    \*    \*    \*

Subpart F. – Machines for Working Metal, Stone, and Other Materials

Subpart F headnotes:

1. For the purposes of this subpart—
(a) the term "machine tool" means any machine used for shaping or surface-working—
(i) metals (including metallic carbides);

\*    \*    \*    \*    \*    \*    \*

whether by cutting away or otherwise removing the material or by changing its shape or form without removing any of it, but does not include rolling mills (item 674.20) or the hand-directed or -controlled tools provided for in items 674.60 and 674.70 of this subpart and in item 683.20 of part 5 of this schedule;

\*    \*    \*    \*    \*    \*    \*

Machine tools:
    Metal-working machine tools:

    \*   \*   \*   \*   \*   \*   \*

674.35       Other\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_    15% ad val.

    \*   \*   \*   \*   \*   \*   \*

Subpart H. – Other Machines

    \*   \*   \*   \*   \*   \*   \*

678.50    Machines not specially provided for, and
       parts thereof\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_    10% ad val.

### THE FACTS

Each party has submitted an affidavit in support of its respective motion: plaintiffs' affidavit was executed by Eric R. Bachmann, president of Ferroquip Corporation; defendant's affidavit was executed by Charles S. Mercer, a vice president of the Morgan Construction Company, Worcester, Massachusetts.

The parties agree, and I find, there is no genuine issue of fact to be tried. The pertinent facts are:

Wire rods and bars are produced by a hot-rolling mill in many thousands of linear feet. According to Mercer's affidavit, the smaller diameter wire rods arrive at the end of the hot-rolling mill at speeds of up to 12,000 feet per minute, while the larger diameter wire bars arrive at the end of the rolling mill at speeds of up to 4,000 feet per

minute. It is obvious, then, that unless these wire rods and bars, which may be thousands of feet in length, are coiled or reeled they would be utterly impossible to handle. This fact is clear from the following description of "rod reels" in United States Steel Corporation's publication *The Making, Shaping and Treating of Steel* (8th ed., 1964), page 781:

> *Rod Reels*—The daily output of rod mills in use today varies from 450 to 1500 net tons, which tonnages, translated into linear units of No. 5 rod, are equivalent to about 1500 and 5000 *miles*, respectively. From this statement it is evident that this enormous output would have been impossible without adequate reeling facilities. As previously pointed out, this need caused the early adoption of automatic reels, the first practical development of which was introduced about 1880. The rod reels now in use are mainly of two types, known as the *pouring reel* and the *laying reel*. * * * [Emphasis added in part.]

The imported merchandise consists of "pouring and laying reels", which are machines used at the end of the steel hot-rolling mills to coil or reel wire rods and bars. When the rods and bars reach the coiling machines, they "are sufficiently rigid as to require some force or energy to put them into the shape of a coil" (Mercer's affidavit, page 3). The coiling operation, however, does not change the cross section, dimensions or physical properties of the rods and bars, and does not advance or improve them for their intended use. Wire rods and bars, generally, are considered as semifinished products intended primarily to be drawn into wire.

Wire rods and bars produced by a hot-rolling mill must be allowed to cool before being further processed into wire, and the coiling of said rods and bars allows this cooling to occur. Wire rods and bars, when in coil form, are often subjected to further processing such as acid dipping, washing, drying and coating with lubricants before being drawn into wire.

### Issue Presented

There is no dispute that the pouring and laying reels are "machines", and the sole issue is whether they are specially provided for as "metal-working machine tools" within the purview of item 674.35, TSUS.

### Opinion

Headnote 1, subpart F, part 4, schedule 6 defines a "machine tool" as "any machine used for shaping or surface-working * * * metals * * * whether by cutting away or otherwise removing the material or by changing its shape or form without removing any of it * * *".

4

It is fundamental, of course, that it is the duty of the court to interpret statutes to reflect Congressional intent. *United States* v. *S. H. Kress & Co.*, 46 CCPA 135, C.A.D. 716 (1959). The crucial question here is whether Congress intended that a machine used for coiling wire rods and bars should be treated as a machine used for "shaping" metals.

Plaintiffs contend that to be classifiable as a metal-working machine tool (viz., machine used for "shaping" metals) a machine must perform an operation upon metal to improve or advance its status for further use, citing *United States* v. *Kurt Orban Co., Inc.*, 47 CCPA 28, C.A.D. 724 (1959), *aff'g* 41 Cust. Ct. 190, C.D. 2041 (1958); and that the pouring and laying reels do not meet that criterion.

Defendant emphasizes that portion of headnote 1 reading "by changing its shape or form without removing any of it", and insists that, since the coiling operation changes the shape or form of the straight wire rods or bars into coils, the pouring and laying reels are within the purview of the definition.

There can be no doubt that by changing the straight wire rods and bars into coils the pouring and laying reels literally change the shape or form of the rods and bars. In essence, the dispute between the parties revolves about whether the language in headnote 1 relied upon by defendant should be given its literal meaning.

In *Kurt Orban*, a scrap baler which compressed voluminous metal scrap into smaller bundles and sheared off excess metal was held not classifiable under paragraph 372 of the Tariff Act of 1930 as a machine tool, since the baler did not "work" on metal in the sense intended by Congress.[2] The majority of the Court of Customs and Patent Appeals agreed with the Customs Court "that the primary function of * * * [machine tools] was to perform an operation upon metal in order to improve and advance its status for further use", whereas "the primary function of the * * * baler is merely that of compressing scrap metal into such form that it becomes more readily available for handling and transportation". In considering the application of the term "work" in the 1930 statutory definition of "machine tool" under paragraph 372, the majority of the appellate court observed (47 CCPA at 30–31):

> The word "work" is susceptible of such a wide variety of meaning that we have grave doubts Congress intended it to be construed as broadly as the Government urges. For example, in a broad sense any tool which changes the shape, size, or even the position of a piece of metal in any manner and for any purpose may be literally said to do "work" on it, even though the nature of that particular "work" be wholly incidental to the

---

[2] The definition of "machine tool" under paragraph 372 of the Tariff Act of 1930 covered "any machine operating other than by hand power which employs a tool for work on metal".

primary function of the device. Under such circumstances there is a substantial doubt in our mind that Congress intended that word to be given such a broad construction, and we think it proper to resolve that doubt in favor of the importer. * * *

Following the rationale of *Kurt Orban*, the Customs Court held that machines for straightening crooked or bent round pipes or tubes were properly dutiable under paragraph 372 as machine tools rather than as machines not specially provided for, where the operation of the tube straightener "might be well described as 'an operation upon metal in order to improve and advance its status for further use'". *Mannesmann-Meer, Inc.* v. *United States*, 55 Cust. Ct. 1, 5, C.D. 2546 (1965).

The undisputed facts herein disclose that the wire rods and bars from the hot-rolling mills are semifinished products, and the coiling thereof does not advance them toward their intended use. The rods and bars after coiling are usually drawn into wire, and the drawing process negates the coiling operation. Moreover, coiling, while literally producing a "change" in the shape or form of the straight wire rod or bar, does not alter its cross section, dimensions or mechanical properties.[3] Plainly, the language *"changing* its shape or form" (emphasis added) in headnote 1 was intended to apply to changes which involve some fabrication, improvement or advancement of metal toward its intended use. Here, the function of the pouring and laying reels involves no fabrication, improvement or advancement of the rods or bars into wire or any other product. In view of the meaning long ascribed to the term "machine tool" under prior tariff acts, it is extremely remote that by the phrase in headnote 1 "changing its shape or form" Congress intended to include "any [machine] which changes the shape, size, or even the position of a piece of metal in any manner and for any purpose". *Cf. Kurt Orban*, 47 CCPA at 30.

In *General Methods Corp.* v. *United States*, 59 CCPA 109, 112, C.A.D. 1049, 458 F. 2d 521 (1972), the Court of Customs and Patent Appeals, citing *United States* v. *Andrew Fisher Cycle Co., Inc.*, 57 CCPA 102, 107, 426 F. 2d 1308, 1311–12, C.A.D. 986 (1970), pointed out that "[t]ariff provisions do not necessarily include everything that falls within their literal meaning"; but the court admonished that "the basis for avoiding the literal interpretation of a provision must be clearly established". In the present case, as in *Kurt Orban*, where a literal interpretation would clearly defeat Congressional intent, a sound basis exists for eschewing a literal construction.

Defendant argues that the rationale of *Kurt Orban* is no longer viable under the broadened definition of "machine tool" in headnote 1.

---

[3] The pouring and laying reels are somewhat analogous to wire spooling machinery, which the Government concededly does not classify under item 674.35. See T.D. 67–186(9).

I find this contention untenable. Although it is true that in the Tariff Schedules of the United States Congress broadened the definition of "machine tool" insofar as it now includes machines that work on materials other than metal,[4] the legislative history of the headnote suggests that there was no intent to reject the rationale of *Kurt Orban*. Thus, at the hearings before the Tariff Commission (now called the International Trade Commission) on schedule 6, the Customs Court's decision in *Kurt Orban* (erroneously referred to in the *Tariff Classification Study* as *Curt Arvin*) was *specifically* called to the attention of the Commission by one of the witnesses who opined that under headnote 1 a scrap baler would be held to be a machine tool. The witness urged that the existing definition of machine tool in the Tariff Act of 1930 be retained, observing that "[w]ork on metal is well understood to mean fabrication and not mere haphazard cutting". Mr. Russell N. Shewmaker, Assistant General Counsel for the Commission, replied that "we do not contemplate when we speak of a machine used for shaping or surface work that we would be treating with anything such as a scrap baler". *Tariff Classification Study* (November 15, 1960), schedule 6, pages 648–649.

Moreover, in *Pitney-Bowes, Inc.* v. *United States*, 59 Cust. Ct. 181, C.D. 3116 (1967), the Customs Court in declining to give a literal interpretation to the TSUS definition of "machine tool" in headnote 1, stressed the legislative history of headnote 1, and the judicial construction of the term "machine tool" under the 1930 and previous tariff acts. The court held that embossing machines used to impress letters or other characters into a metal plate, so that one surface has slight protuberances and the other surface has slight depressions, did not perform the kind of change in shape or form contemplated by Congress to bring a machine within the definition in headnote 1.

Additionally, both parties have cited *Broderick & Bascom Rope Co.* v. *United States*, 65 Cust. Ct. 400, C.D. 4112 (1970). There, the Customs Court held that item 674.35, TSUS, was applicable to a wire strander, which twists or bends a multiple number of wires into strands for making wire ropes, but does not remove any of the wire or change the dimensions of the individual wires. In *Broderick & Bascom*, the Court of Customs and Patent Appeals, 59 CCPA 130, C.A.D. 1053, 460 F.2d 1070 (1972), without deciding whether the stranders were

[4] The *Tariff Classification Study* (November 15, 1960), schedule 6, page 271 states:

Headnote 1 defines the term "machine tool" more broadly than it is defined in the present provisions of paragraph 372 where it is defined as "any machine operating by other than hand power which employs a tool for work on metal". Under the proposed definition, the term would apply not only to metal-working tools but also to machines used for shaping or surface-working stone, ceramics, concrete, asbestos, cement, and like mineral materials, glass in the cold, wood, cork, bone, hard rubber or plastics, or other hard materials. These latter machine tools are significant articles of trade and it is desirable to have a separate provision therefor in the proposed schedules.

classifiable as machine tools under item 674.35,[5] reversed on the ground that the stranders were more specifically provided for as cordage machines under item 670.90 of the Tariff Schedules of the United States.

It should be noted that the stranders fabricated and advanced multiple individual wires into "strands" for use in making wire ropes, whereas here, after the coiling operation of the pouring and laying reels, wire rods and bars still remain only wire rods and bars. Hence, the function of the wire strander is not analogous to that of the pouring and laying reels.

In summary, the pouring and laying reels are not machines used for shaping or surface-working, and do not change the shape or form of metal within the meaning of headnote 1 as contemplated by Congress. Accordingly, I conclude that the imported machines are not classifiable as machine tools under item 674.35, but are properly dutiable as machines not specially provided for under item 678.50. Plaintiffs, therefore, are entitled to summary judgment, and judgment will be entered accordingly.

(C.D. 4667)

---

[5] The appellate court commented (59 CCPA at 134): "If the present wire stranders do fall within the description of the provision for machine tools, it must be because a broad interpretation is given to the terms 'shaping or surface-working' and 'by changing its shape and form without removing any of it' in the Schedule 6, Part 4, Subpart F headnote."