**EM INDUSTRIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 98–31.**

**Court No. 94–08–00478.**

United States Court of International Trade.

March 24, 1998.

Simons & Wiskin, Philip Yale Simons, Jerry P. Wiskin, New York City, for Plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Washington, DC, Joseph I. Liebman, Attorney in Charge, Intern. Trade Field Office, Barbara M. Epstein, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, New York City, Edward Maurer, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, Spring Valley, NY, of counsel, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge.

### INTRODUCTION

This action concerns the proper tariff classification, and hence rate of duty, under the Harmonized Tariff Schedule of the United States ("HTSUS") for "pearlescent pigments" imported by E.M. Industries, Inc., plaintiff in this action, from Germany in 1992–93. Two types of pearlescent pigments are involved: mica coated with titanium dioxide and mica coated with iron oxide.[1]

The mica-based pigment coated with titanium dioxide was classified by the Customs Service ("Customs") under subheading 3206.10.00, HTSUS, as "pigments or preparations based on titanium dioxide." The mica-based pigment coated with iron oxide was classified under subheading 3206.49.20, HTSUS, as "other coloring matter and other preparations ... other ... preparations based on iron oxide."

There is no dispute between the parties that the pearlescent pigments are properly classifiable under HTSUS Heading 3206. Plaintiff, however, claims that the merchandise is outside the scope of the specific subheadings of Heading 3206 under which they were classified by Customs and that all of the pearlescent pigments are properly dutiable under the residual or "basket" subheading 3206.49.50, HTSUS, as "Other," (under "other coloring matter and other preparations").

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a). At a bench trial, three witnesses testified for plaintiff and one witness testified on behalf of defendant. The record also includes numerous exhibits. After careful review of the testimony of record, exhibits, and briefs of counsel, the court concludes that Customs' classifications are incorrect and that plaintiff's claim should be sustained.

---

1. In some pearlescent pigments covered by this action, titanium dioxide is the only metal oxide, while in other pearlescent pigments, iron oxide is the only metal oxide. However, in two out of the approximately 26 different pearlescent pigments at issue, both titanium dioxide and iron oxide

### FINDINGS OF FACT

1. The subject merchandise, pearlescent or synthetic nacreous pigments, consist of platelets having a micaceous substrate coated with a thin film or layer of either titanium dioxide or iron oxide.

2. The platelets are transparent, consist of alternating layers of materials with a high and low refractive index, and in addition to exhibiting color, simulate the nacreous luster of natural pearls.

3. "The characteristics of nacreous pigments are inherent in the physical properties of the pigment particles." Pltf's Exh. C attached to Reply Mem., at p. 829. For instance, the interference color effect of pearlescent pigments arises from a physical structure of uniform, thin layers of the pearlescent pigment particle's constituents rather than from discrete metal oxide pigment particles.

4. Such physical properties of pearlescent pigments as platelet transparency or opacity, length, diameter, platy shape, thickness, smooth surfaces, high refractive index, are all non-chemical or physical properties that bear on the unique visual characteristics of pearlescent pigments. "The effects which are produced by pearlescent pigments are intimately connected to optics and the interaction of light with matter." See Pltf's Exh. D, p. 1.

5. As a result of reflection and refraction of light, synthetic nacreous pigments possess a pearl-like luster ("pearlescence"), and also, depending upon the thickness of the metal oxide layer, they can also exhibit interference color effects. Pltf's Reply Mem., Exh. A. A unique characteristic of pearlescent pigments is that their color effects are angle-dependent (depend on the viewing angle).

6. Unlike pigment grade or "pigmentary" titanium dioxide and iron oxide, the physical properties of pearlescent pigment particles are based on the platy shape of the mica substrate. These mica substrates result from grinding natural mica into small plate-

---

layers are present, with the outer layer being titanium dioxide or iron oxide depending upon the desired color. For purposes of discussion, however, references will be made only to pearlescent pigments with either a layer of titanium dioxide or of iron oxide.

lets. Mica, the particles of which have the desired platiness but inadequate refractive index, contributes its geometric shape to the metal oxide layer which has the requisite refractive index but does not spontaneously occur in the requisite platelike form. To produce the optical effect of imitating pearls, *i.e.*, producing a pearly luster, pearlescent pigments must have platy-shaped pigment particles.

7. Layers of titanium dioxide and iron oxide are not directly deposited on the mica substrates, but rather the metal oxide layers result from chemical reactions of certain precursor or intermediate chemical compounds.[2]

8. To produce colors by "constructive interference" (an optical property of pearlescent pigments), it is necessary for the mica substrate and the metal oxide coating materials to have different indices of refraction in order to create "boundaries" from which light can be reflected. The "boundaries" essential to interference colors produced by substances with different indices of refraction require both the low refractive index substrate and a high refractive index coating material.[3] As previously noted, the mica substrate also provides the proper geometric shape to the pigment platelet (including the shape of the metal oxide coatings) and provides the platelets with the necessary mechanical strength essential to the pearlescent pigment's commercial use.[4] In pearlescent pigments both the thin film metal oxide layer and mica substrate are essential constituents to the unique optical properties of pearlescent pigments.

9. Pearlescent pigments are known as "effect" pigments because they have the unique optical property of pearlescence as well as color. The pearl effect requires the platy shape of the pearlescent pigment particle, which in turn requires the platy-shaped mica substrate. Both pearlescence and constructive interference involve an extremely close physical and functional interface, and unitary, integral and interdependent relationship of the mica substrate and coating material in the pigment particles.

10. The pearlescent pigment's luster or pearlescence, results from different optical phenomena than those involved in the production of color. Pearl luster is produced by reflection of light from the top surface of the pearlescent pigment particles which are oriented in a layered arrangement, whereas the colors produced by a pearlescent pigment (interference colors) result from the constructive interference of light from reflection at internal boundaries within each pearlescent pigment particle (which result from the disparity between indices of refraction of the mica substrate and the coating material).

11. Interference colors may be controlled by varying the geometric thickness of the metal oxide film (*i.e.*, the controlled thickness of the coating materials on the substrate). Thus, if the layers of titanium dioxide or iron oxide are very thin, a white pearl reflection color is produced; increasing the layer thickness gives gold, red, blue and green reflection colors in order of increasing layer thickness.

12. The phenomena underlying the properties of pearlescence and constructive interference of light are not present in the traditional pigmentary forms of the named metal oxides. Moreover, a unique optical property of pearlescent pigments is their ability to show multiple color effects: they can show

---

2. During manufacture of the pearlescent pigments, certain titanium and iron containing precursor compounds (usually titanium tetrachloride, titanyl sulfate, and ferric chloride) undergo chemical reactions ultimately resulting in the synthesis of titanium dioxide and iron oxide which form the thin film coatings on the mica substrate. In that regard, deft's Exh. E discloses: "Mica generally is coated by adding a solution of one or more metal salts (e.g. $TiOSO_4$ $FeCl_3$) to an aqueous mica suspension. The reaction conditions (concentration, temperature, etc.) are controlled in a way that results in the hydrolysis of the metal salt to an insoluble metal oxide, or hydroxide, deposited on the mica platelets."

3. The boundaries between the metal oxide, which has a high refractive index, and the mica, which has a lower refractive index, causes light to be reflected from the boundary and to constructively interfere to produce color. If the mica and the metal oxide did not have different indices of refraction, there would be no boundaries, no interference with light, and hence no interference color would be produced.

4. As pointed out in Deft's Exh. E, p. 6: "Pearlescent pigments, as compared to other colorants, are mechanically sensitive. The pigment platelets might break or the metal oxide layer on the mica might be removed if they are handled improperly."

two different colors when viewed at two different angles. Pltf's Exh. 8.

13. Physically (*i.e.*, particle size, shape, structure) and functionally titanium dioxide and iron oxide are altogether different in the pigmentary forms of the metal oxides and in the thin film layers of mica-based pearlescent pigments. Pigmentary titanium dioxide, for example, is a white, opaque, discrete, spherical particle capable of scattering light that strikes the pigment particle to produce a white color; the titanium dioxide coating over the mica substrate of a pearlescent pigment is a thin transparent film which reflects or transmits light. Iron oxide in pigmentary form is red, opaque, absorbs certain wavelengths of light and reflects others, and otherwise physically and functionally differs from the thin film of iron oxide coated on mica in a pearlescent pigment.[5] The pigmentary forms of the metal oxides produce color by absorption while pearlescent pigments produce color by constructive interference.

14. Unlike pigmentary titanium dioxide which only produces the color white, pearlescent pigments comprised of titanium dioxide coated on mica produce colors which range from silver to every color in the rainbow. Unlike pigmentary ferric oxide, which only produces the color red, pearlescent pigments comprised of iron oxide coated on mica produce colors which range from shades of brown to various shades of red. In sum, from the aspects of both pearlescence and the way color is achieved, pearlescent pigments are physically and functionally a different category of pigments than the absorption pigments, the category to which most pigments belong. *See* figure 1, Deft's Exh. E, p. 1.

15. "The visual appearance of a transparent pigment material consists of light components that have travelled different distances ***, thereby giving the material an impression of depth *that cannot be achieved by other methods.*" *Id.* (Emphasis added.)

16. In the pigment industry, pearlescent pigments comprised of mica coated with a metal oxide are sometimes referred to as mica-based pigments, *Id.* at 6, or as pigments based on iron oxide coated mica, Pltf's Exh. 8, or as mica-containing pearlescent pigments based on titanium dioxide. Deft's Exh. E, p. 3.

17. Chemically, the metal oxide films coating the mica in the pearlescent pigments are identical to "pigmentary" titanium dioxide ($TiO_2$) and iron oxide ($FeO_3$), but that chemical identity of the metal oxides is where any similarity of pearlescent pigments to the pigmentary forms of metal oxides ends. Because of their special optical or functional properties, metal oxide coated mica pearlescent pigments are regarded by the pigment industry as a separate category of inorganic pigments different from conventional light absorbing pigments, the most common category of pigments. Deft's Exh. E, p. 1. Defendant readily concedes that in the pigments industry, the mention of "titanium dioxide" generally connotes the traditional "absorption" type pigment—pigmentary (or pigment grade) titanium dioxide—not mica-based synthetic nacreous or pearlescent pigments with a thin film layer of the metal oxide that effects colors *and* pearlescence by completely different phenomena. Deft's Pretrial Mem. at 28–30.

18. Since without the mica substrate, pure $TiO_2$ cannot be produced economically in a platy shape, deft's exh. E, p. 3, the mica substrate is an integral and essential constituent of pearlescent pigments. Although commercially impracticable, a patented technology exists to dissolve away the mica substrate after formation of the pigment particle, leaving an "unsupported" pearlescent pigment composed of the metal oxide material.[6]

---

5. Deft's Exh. E, p. 2, points up the functional and structural distinctions: "Contrary to absorption pigments (e.g. iron oxides, titanium dioxide, organic pigments), the color of an interference [*i.e.*, pearlescent] pigment is not caused by diffuse scattering of unabsorbed portions of light, but by directed light reflection of specific wavelengths. Consequently, visible color and brightness are different at different observation angles [the color of absorption pigments is angle-independent, while colors of pearlescent pigments change when the colors are observed under different angles]." Structurally, "[t]he particle size of pearlescent pigments is distinctively larger than that of absorption pigments."

6. Defendant adduced at trial testimony of an expert witness, Dr. Sullivan, and the "Armanini"

## PARTIES' CONTENTIONS

*Plaintiff:*

(1) Pearlescent pigments are not classifiable within subheadings 3206.10.00 and 3206.49.20 and fall within the residual provision subheading 3206.49.50 because they are physically and functionally of a different class of coloring matter than that covered by those subheadings. Specifically, the "pigments based on titanium dioxide" covered by subheading 3206.10.00 are "pigmentary" (pigment grade) titanium dioxide, which is used to produce a white color; "preparations based on iron oxide" of subheading 3206.49.20 are "pigmentary" (pigment grade) iron oxide.

(2) Defendant improperly invokes the HTSUS general rules of interpretation ("GRI") 1 and 2(b) to expand the scope of subheadings 3206.10.00 and 3206.49.20 to include pearlescent pigments, which were not intended to be covered by those subheadings.

(3) In determining the legislative intent as to the scope of subheadings 3206.10.00 and 3206.49.20, the court should, as it has repeatedly done in the past, look for guidance in *The Harmonized Commodity Description and Coding System General Explanatory Notes* ("*Explanatory Notes*"), published by the World Customs Organization (established in 1952 as the Customs Co-operation Council), Heading 32.06. That pearlescent pigments were intended to be classified separately from the pigmentary forms of metal oxides under Heading 3206, HTSUS, is plainly evident from their listing in Heading 32.06 of the *Explanatory Notes* separate from pigments based on metal oxides.

(4) Following the rationale of *Siemens America, Inc. v. United States*, 84 Cust.Ct. 180, C.D. 4856, 496 F.Supp. 266 (1980), *rev'd on other grounds*, 68 C.C.P.A. 62, C.A.D. 1266, 653 F.2d 471 (1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982), the "based on" language of the statute must be applied to the *sine quo non* of the pearlescent pigments—both the metal oxide coating and the mica substrate—and not simply the metal oxide coating.

(5) Pearlescent pigments cannot be "based on" titanium dioxide or iron oxide as neither compound independently preexists as a constituent material during the manufacture of the pearlescent pigments; moreover, pearlescent pigments cannot be "based on" the named metal oxides since they do not standing alone impart the "essential character" to pearlescent pigments.

(6) An analysis of the *Explanatory Notes* to Chapter 32 demonstrates that the term "preparation" as used in the chapter and in subheading 3206.49.20 refers to products prepared by mixing coloring matter with binders or solvents, or to a dispersion of coloring matter in a binder—not to iron oxide coated mica.

*Defendant:*

(1) Subheadings 3206.10.00 and 3206.49.20 embrace all forms of pigments and/or preparations based on titanium dioxide or iron oxide, regardless of the physical form of the metal oxides or the functional or optical characteristics of the pigments.

(2) GRI 1 and 2(b) support Customs' classifications of the merchandise.

(3) The separate listing of pearlescent pigments under the coloring matters covered by the *Explanatory Notes* under Heading 32.06, relied on by plaintiff, does not suggest that they should be similarly separately classifiable from the pigmentary forms of the metal oxides under subheadings 3206.10.00 and

patent (Deft's Exh. F) in order to demonstrate the possibility of dissolving away the mica substrate after the creation of a pearlescent pigment particle, thus leaving solely an "unsupported" metal oxide coating as a "pearlescent pigment" that provides both color and luster. According to Dr. Sullivan, in the unsupported pearlescent pigment the platy shape of the metal oxide remains after the mica substrate is removed and the requisite contrasting low index of refraction required for production of color by constructive interference is provided merely by air. This line of evidence demonstrates that while the metal

oxide constituent provides the high refractive index material essential to the functions of a pearlescent pigment, the pigment particle's essential platy shape is due solely, at least initially, to the mica substrate, and that even after formation of the pigment particle, mica (or some other appropriate index of refraction substrate) remains essential to the pearlescent pigment's optical properties. Finally, defendant concedes, that Armanini's patented methodology for dissolving away the mica substrate after formation of the platelet has no commercial application whatever.

3206.49.20. Unlike the separate listing of pearlescent pigments under Heading 32.06 of the *Explanatory Notes,* Congress provided no separate subheading for such pigments under Heading 3206, HTSUS. Therefore, notwithstanding their separate listing in the *Explanatory Notes,* Congress must have intended that pearlescent pigments be classified together with the pigmentary forms of titanium dioxide or iron oxide classifiable under subheadings 3206.10.00 or 3206.49.20, not under the residual provision of the Heading.

(4) Under the *Siemens* rationale, the pearlescent pigments are "based on" the named metal oxides since they are fundamental and essential components of the pearlescent pigments. Whether or not the mica substrate is also essential is legally immaterial; in any event, the mica substrate is not an essential component of pearlescent pigments.

(5) The pearlescent pigments are "preparations" as that term in defined in *United States v. P John Hanrahan, Inc., Trans., Wm. Bernstein Co., Inc.,* 45 C.C.P.A. 120, C.A.D. 684, 1958 WL 7380 (1958).

(6) Neither the "preexisting material" nor "essential character" lines of cases relied on by plaintiff apply to the statutory language "based on."

### CONCLUSIONS OF LAW

1. The *Explanatory Notes* although not binding on the court, have repeatedly been recognized by this and our appellate court, and indeed, Customs,[7] as instructive in clarifying the legislative intent regarding the scope of certain provisions of the HTSUS. *See e.g., Midwest of Cannon Falls, Inc. v. United States,* 122 F.3d 1423, 1428 (Fed.Cir. 1997); *Marubeni Am. Corp. v. United States,* 35 F.3d 530, 535 n. 3 (Fed.Cir.1994); *Mita Copystar America v. United States,* 21 F.3d 1079, 1082 (1994); *Lynteq, Inc. v. United States,* 976 F.2d 693, 696 (Fed.Cir.1992); *Sabritas, S.A. de C.V. and Frito–Lay, Inc. v. United States,* Slip Op. 98–14, —— CIT ——, 1998 WL 107625 (February 20, 1998); *H.I.M./Fathom, Inc. v. United States,* 981 F.Supp. 610 (CIT 1997); *Bausch & Lomb,*

*Inc. v. United States,* 957 F.Supp. 281, 288 (CIT 1997), *appeal docketed,* No. 97–1333; *Marcor Development Corp. v. United States,* 926 F.Supp. 1124, 1133 (CIT 1996); *Pima Western, Inc. v. United States,* 915 F.Supp. 399 (CIT 1996). *But see Winter–Wolff, Inc. v. United States,* 996 F.Supp. 1258 (CIT 1998) (where *Explanatory Notes* did not specifically include or exclude a particular item from a tariff heading, court derived no guidance from the Notes). As discussed below, pearlescent pigments are expressly separately listed under the coloring matters included in Heading 32.06 of the *Explanatory Notes,* from pigments based on various metal oxides, including titanium dioxide.

2. In the recent decision of this court, *Baxter Healthcare Corp. of Puerto Rico v. United States,* Slip Op. 98–16, —— CIT ——, 1998 WL 107624, p. 14 n. 4 (February 24, 1998), wherein defendant relied on the *Explanatory Notes,* Chief Judge Carman explained:

> The *Explanatory Notes* constitute the World Customs Organization's official interpretation of the HTSUS. While not legally binding on the parties, the Notes provide a commentary on the scope of each heading and interpretative rule of the HTSUS and are useful in ascertaining the classification of merchandise under the HTSUS. *See Lonza, Inc. v. United States,* 46 F.3d 1098, 1109 (Fed.Cir.1995) ("While the *Explanatory Notes* do not constitute controlling legislative history, they do offer guidance in interpreting HTS[US] subheadings."); *see also Rollerblade, Inc.,* 112 F.3d at 486 n. 3 (although the *Explanatory Notes* are not controlling legislative history, "they are nonetheless intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting its subheadings"). The Customs Service itself asserted that the *Explanatory Notes* "should be consulted for guidance." HQ 954822 (December 22, 1994).

■ 3. While construing a statute so as to carry out the legislative intent requires

---

7. *See* 26 Cust.Bull. 446, C.S.D. 92–17 (1992) (Customs relied on Explanatory Notes for scope of HTSUS provisions and for the classification of a food product prepared by the removal of butter fat under subheading 1901.90.3030, HTSUS, as an article of milk or cream, not specially provided for, rather than under 2106, HTSUS, for preparations based on butter or other fats).

that the court first look to the statutory language itself, *Siemens,* 68 C.C.P.A. at 68, 653 F.2d 471, that does not mean, however, the court is foreclosed from also considering readily available guidance from the *Explanatory Notes* as to the intended scope of subheadings. "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function ..." *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

4. The fundamental rule in customs jurisprudence that an *eo nomine* statutory designation without limitations includes all forms of the described article is subject to a qualification that there is no showing of a contrary legislative intent. *Nootka Packing Co. v. United States,* 22 CCPA 464, T.D. 47464, 1935 WL 2283 (1935); *Hasbro Indus., Inc. v. United States,* 879 F.2d 838, 840 (1989). Moreover, even where merchandise falls within the literal language of the statute, such literal interpretation should be rejected if it produces a result contrary to the apparent legislative intent. *Procter & Gamble Manufacturing Co. v. United States,* 19 C.C.P.A. 415, T.D. 45578, 1932 WL 2122 (1932), *cert. denied,* 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546 (1932); *Schmidt, Pritchard & Co., Inc. v. United States,* 77 Cust.Ct. 1, C.D. 4666, 1976 WL 29301 (1976). A seemingly broad descriptive tariff term is not to be taken as encompassing every article which may literally come within that term, but rather only those articles of the type intended by Congress. *United States v. General Electric Co.,* 58 C.C.P.A. 152, 156, 441 F.2d 1186, C.A.D. 1021 (1971); *United States v. Andrew Fisher Cycle Co.,* 57 C.C.P.A. 102, 426 F.2d 1308, C.A.D. 986 (1970).

5. The *Explanatory Notes,* Heading 32.06, explicitly identify what coloring matter is included within the scope of "pigments based on titanium dioxide," which language exactly mirrors that used in subheading 3206.10.00, HTSUS, and significantly the scope or such language in Heading 32.06 does not include pearlescent pigments. Rather, under Heading 32.06 "synthetic nacreous (pearl) pigments" (including mica coated with titanium dioxide or titanium dioxide and ferric oxide), are listed separately under No. (13)(b).

6. Moreover, the organizational format of Heading 32.06 listing pigments and/or preparations based on specific compounds (including pigments based on titanium dioxide) closely parallels the HTSUS Heading 3206 organizational breakout of subheadings covering pigments based on specific compounds, including titanium dioxide.

7. The court finds the *Explanatory Notes* very persuasive guidance as to the intended classification of pearlescent pigments *vis-a-vis* the scope of subheadings 3206.10.00, 3206.49.20. Unquestionably, under Heading 32.06 of the *Explanatory Notes* mica-coated pearlescent pigments (including those containing titanium dioxide) were differentiated from "pigments based on titanium dioxide" by listing them separately, and therefore, by extension would also be differentiated from preparations based on iron oxide. ostensibly, then, pearlescent pigments were not recognized as falling in the same category as "pigments based on titanium dioxide," but rather as warranting separate treatment under Heading 32.06.

8. Given the exclusion of nacreous pigments from "pigments based on titanium dioxide" (item No. 1) in Heading 32.06 of the *Explanatory Notes* and their separate treatment under Heading 32.06 (item No. 13),[8] the court agrees with plaintiff that Congress did not intend synthetic nacreous pigments be classified under either subheading 3206.10.00 or 3206.49.20. *Cf. Midwest of Cannon Falls, Inc., supra.* ("The government's argument that the terms 'Christmas tree ornament' and 'Christmas ornament' are interchangeable is further undercut by the fact that

---

**8.** Plaintiff also stresses, pretrial brief, at 30 n. 48, that the *Explanatory Notes'* treatment of pearlescent pigments separate and apart from pigments based on titanium dioxide or preparations based on iron oxide, parallels the separate treatment of

those products in industry literature. *See Pigments Handbook* (1988) and *Ullmann's Encyclopedia of Industrial Chemistry,* Fifth, Completely Revised Ed., 1991 (Pltf's Collective Exh. E to pltf's pretrial brief).

'Christmas candles' and 'Christmas *tree* candles' are referred to separately in the *Explanatory Notes* to heading 9505. *See Explanatory Notes* 95.05(B)(b)") (emphasis in original); *see also, H.I.M./Fathom, Inc., supra* ("[T]he *Explanatory Notes* are persuasive authority for the Court when they specifically include or exclude an item from a tariff heading.") The court concludes that Congress intended that the nacreous pigments separately described in item No. 13 of Heading 32.06 of the *Explanatory Notes* (whether a mica-based pearlescent pigment is coated with titanium dioxide or iron oxide) would be classified under the residual provision, subheading 3206.49.50, HTSUS.

■ 9. "Basket" or residual provisions of HTSUS Headings, such as subheading 3206.49.50, are intended as a broad catch-all to encompass the classification of articles for which there is no more specifically applicable subheading.

10. *Siemens* addressed the scope of item 709.66, TSUS, covering "Apparatus based on the use of radiation from radioactive substances" holding that a radioactive substance must be the *sine quo non* or a fundamental and essential constituent of the article. 84 Cust.Ct. at 185, 496 F.Supp. at 269. This holding was affirmed on appeal. *United States v. Siemens America, Inc.,* 68 C.C.P.A. 62, 68, C.A.D. 1266, 653 F.2d 471 (1981). *See* also *Amersham Corp. v. U.S.,* 564 F.Supp. 813 (1983) (the court followed *Siemens* in finding that a radioactive substance was "crucial, essential, and indispensable to the proper functioning" of an ionizing smoke detector, and therefore, the smoke detector was an apparatus based on the use of radiations from radioactive substances under item 709.66, TSUS).

11. Notwithstanding that the "based on" language of item 709.66, TSUS, construed in *Siemens* is also used in the relevant subheadings of Heading 3206, HTSUS, *Siemens'* in-terpretation of item 706.66, TSUS, while instructive,[9] is plainly not dispositive of the classification of the totally dissimilar and unrelated subject matter covered by the subheadings at issue, particularly in light of the *Explanatory Notes* under Heading 32.06. As the interpretation of item 709.66, TSUS, was not aided by an explanatory note in the Tariff Classification Study or other legislative history, *Siemens* quite properly relies solely on the common meaning of the statutory language to glean the legislative intent. By contrast, as to the scope of the relevant subheadings in the HTSUS, the court has sought guidance from the *Explanatory Notes* to Heading 32.06, as discussed above. *See and compare Libbey Glass, Div. of Owens–Illinois, Inc. v. United States,* 921 F.2d 1263 (Fed.Cir.1990).

12. While the classification of goods under the HTSUS is governed by the principles embodied in the GRI, and accordingly, classification is determined according to the terms of the headings and notes, *Pima Western, Inc., supra,* the court must still construe the terms and scope of the headings utilizing the usual guides to statutory construction, and in determining the scope of the subheadings the court may examine relevant *Explanatory Notes. See Pima Western, Inc., supra,* 915 F.Supp. at 402; 26 Cust.Bull. 446, C.S.D. 92–17 (1992) (Customs cited the GRIs, but relied on the *Explanatory Notes* to HTSUS for determining the scope of the headings). Fundamentally, GRI 1 and 2(b) cannot be used simply to "bootstrap" the classification of merchandise into subheadings that were not intended to fall within their purview. *See* Interpretative Rules as set forth in *Explanatory Notes* at GRI 1(V) and GRI 2(XII); *Better Home Plastics Corp. v. United States,* 916 F.Supp. 1265 (CIT 1996), *aff'd* 119 F.3d 969 (1997).

13. "In view of the aforementioned legal conclusions, the court need not reach plain-

---

9. The Tariff Schedules of the United States were adopted pursuant to the Tariff Classification Act of 1962, Pub.L. 87–456, May 24, 1962, 76 Stat. 72, as amended, and became effective on and after August 31, 1963, Proc. No. 3548 of August 21, 1963, 28 F.R. 9279. The HTSUS which replaced the TSUS was enacted on August 23, 1988, pursuant to the Omnibus Trade and Competitiveness Act of 1988, P.L. 100–418, 102 Stat. 1148 (codified at 19 U.S.C. § 1202 (1988)) and became effective on January 1, 1989. *See* The Conference Report of the Omnibus Trade Act of 1968, H.Conf.R. No. 576, at 549–50 (decisions interpreting TSUS nomenclature are not deemed dispositive in interpreting the HTS, but may be considered instructive on a case-by-case basis in interpreting the HTS); *Beloit Corp. v. United States,* 843 F.Supp. 1489, 1495 *et seq.* (1995); *Glass Products, Inc. v. United States,* 641 F.Supp. 813, 10 CIT 253 (1986).

tiff's contentions respecting the applicability of the preexisting material doctrine" [10] or the "essential character" line of cases applying the term "almost wholly of" as used in General Headnote 9(f)(iii), TSUS, or reach plaintiff's argument that the *Hanrahan* definition of a "preparation" would be out of the context in which that term is used in Heading 3206.

### CONCLUSION

There is no dispute that in their condition as imported the pearlescent pigments at issue contained the chemical compounds titanium dioxide or iron oxide, and there is no dispute that those compounds are fundamental and essential constituents of the mica-based pearlescent pigments. Whatever the apparent plausibility of defendant's insistence that *a fortiori* under the rationale of *Siemens* such pearlescent pigments are classifiable as "based on" titanium dioxide or iron oxide, the court is nonetheless persuaded by the evidence adduced at trial and the *Explanatory Notes* that pearlescent pigments should be recognized as separate class of coloring materials from those intended to be classified under subheadings 3206.10.00 and 3206.49.20. As the separate and discrete treatment of pearlescent pigments found under Heading 32.06 of the *Explanatory Notes* did not carry over into Heading 3206 as a specific subheading covering synthetic nacre-

ous pigments, the court concludes that they are properly dutiable under the residual provision for coloring matters, subheading 3206.49.50, as claimed by plaintiff.

Accordingly, based on the foregoing findings of fact and conclusions of law judgment is entered for plaintiff.

### JUDGMENT

This action having been duly submitted for decision and this court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that the subject entries of pearlescent pigments liquidated by the United States Customs Service under subheading 3206.10.00 or subheading 3206.49.20 of the Harmonized Tariff Schedule of the United States ("HTSUS") are properly dutiable under subheading 3206.49.50, HTSUS, as claimed by plaintiff; and it is further

ORDERED, ADJUDGED AND DECREED that a judgment be, and hereby is entered for, plaintiff; that the subject entries be reliquidated accordingly at the applicable rates of duty under subheading 3206.49.50, HTSUS; and that excess duties be refunded with interest thereon as provided by law.

**10.** Such statutory language as "made of," "manufactured of" or "composed of" used in connection with named materials have been held to imply that the named material of which the finished and product is "made of" or "manufactured of" had a prior, separate, and independent existence before being made into the completed article, *see e.g., United States v. Accurate Millinery Co.*, 42 C.C.P.A. 229, C.A.D. 599 (1955); and

*Cohn & Lewis v. United States*, 25 C.C.P.A. 220, T.D. 49335, 1937 WL 3306 (1937). *Cf. Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481 (Fed.Cir.1997). Similarly, by extension plaintiff contends that the statutory language "based on" with reference to named materials also connotes the independent preexistence of the named materials.