SLIP OP. 08–60

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STATES,<br><br>                                        Plaintiff,<br><br>v.<br><br>UPS CUSTOMHOUSE BROKERAGE, INC.,<br><br>                                        Defendant. | BEFORE: JUDGE GREGORY W. CARMAN<br><br>Court No. 04-00650 |

[Held: after trial, the Court finds that Defendant misclassified the subject merchandise; that such misclassifications under the circumstances of this case constitute multiple failures to exercise responsible supervision and control in violation of section 641 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1641; and that the consequent fines imposed by Plaintiff are fair and reasonable. Judgment for Plaintiff.]

Gregory G. Katsas, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Melinda D. Hart, Courtney E. Sheehan, and Nancy Kim); Edward Greenwald, of counsel, Department of Homeland Security, U.S. Customs and Border Protection, for Plaintiff.

Akin, Gump, Strauss, Hauer & Feld, LLP (Terence J. Lynam, Lars-Erik A. Hjelm, and Tamir A. Soliman), for Defendant.

May 28, 2008

## POST-TRIAL OPINION

CARMAN, JUDGE: The Bureau of Customs and Border Protection ("Customs")

initiated this action[1] against Defendant, UPS Customhouse Brokerage, Inc. ("UPS")

---

[1]This Court has three times issued opinions concerning the instant litigation. See United States v. UPS Customhouse Brokerage, Inc., 30 CIT __, 442 F. Supp. 2d 1290

seeking to enforce monetary penalties of $75,000 for UPS's alleged violation of section

641 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1641 (2000) ("the broker statute").[2]

In order to prevail, Customs needs to satisfy the statutory requirements of

section 1641(b)(4),[3] which require that it prove, by a preponderance of the evidence,

(1) that UPS was a licensed "customs broker"; (2) that UPS was engaged in "customs

business"; and (3) that UPS failed to "exercise responsible supervision and control" over

its "customs business." 19 U.S.C. § 1641(b)(4). As noted below, the parties have

stipulated as to the first two elements. See Agreed Facts ¶¶ 1–8, infra. Therefore, the

only remaining legal issue is for Customs to prove, by a preponderance of the evidence,

the third element—that UPS failed to "exercise responsible supervision and control."

Customs alleges that UPS failed to "exercise responsible supervision and

control" over its customs business by repeatedly misclassifying certain entries of

---

(2006) (denying UPS's motion for partial summary judgment and Customs's motion to strike) ("UPS I"); United States v. UPS Customhouse Brokerage, Inc., 30 CIT __, 464 F. Supp. 2d 1364 (2006) (granting UPS's motion to certify question), appeal den., 213 Fed. Appx. 985, 986, 2006 WL 3913545, at *1 (Fed. Cir. Dec. 29, 2006); United States v. UPS Customhouse Brokerage, Inc., 31 CIT __, Slip Op. 07-104 (Jul. 2, 2007) (denying Customs's motion for summary judgment) ("UPS II"). Familiarity with these decisions is presumed.

[2]Section 641(d)(1)(C) of the Tariff Act of 1930 permits Customs to impose a monetary penalty when a broker "has violated any provision of any law enforced by the Customs Service or the rules or regulations issued under any such provision." 19 U.S.C. § 1641(d)(1)(C).

[3]Section 641(b)(4) of the Tariff Act of 1930 requires a customs broker to "exercise responsible supervision and control over the customs business that it conducts." 19 U.S.C. § 1641(b)(4).

merchandise under subheading 8473.30.9000 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Merchandise properly classified under HTSUS 8473.30.9000 must contain a cathode-ray tube ("CRT"). Notwithstanding extensive warnings to UPS and remedial training by Customs, UPS continued to misclassify a variety of electronic merchandise under HTSUS 8473.30.9000 (parts and accessories of automated data processing machines) (hereinafter "30.90") despite the statutory requirement that items classifiable under 30.90 contain a CRT. UPS's persistence in this regard culminated in multiple violations of the broker statute. Accordingly, Customs levied a total of $90,000 in fines against UPS, of which $15,000 was paid. This action was instituted to collect the remaining $75,000 balance.

## I.    Procedural Posture — The Trial

A bench trial was held on December 4–6, 2007 and continued on December 19, 2007.[4] Testimony was taken from various witnesses and the parties also submitted post-trial briefs on January 30, 2008.[5]

---

[4]Counsel for the parties submitted a joint Pretrial Order ("PTO") that included a schedule of uncontested facts and witness list. The PTO, drafted and endorsed by counsel, was made an Order of this Court on November 20, 2007. Parties additionally submitted to the Court their respective trial exhibits. The parties also agreed to have the majority of their respective trial exhibits admitted into evidence and withdrew those exhibits where the parties could not agree.

[5]Parties filed separate post-trial briefs on February 7, 2008. On February 14, 2008, UPS submitted a letter to this Court requesting permission to file a reply brief to respond to certain arguments made by Customs in its post-trial brief. This Court denied that request. See Order, dated Feb. 15, 2008. On April 11, 2008, Customs filed a motion,

(continued...)

At trial, the Court heard testimony from six witnesses. Customs produced:

(1) Ms. Lydia Goldsmith, a Supervisory Import Specialist and Trade Enforcement Coordinator at the Customs Area Port of Cleveland, Ohio; (2) Mr. Daniel Piedmonte, former Field National Import Specialist at the Customs Area Port of Cleveland, Ohio; (3) Mr. Karl Moosbrugger, former Import Specialist at the Customs Area Port of Cleveland, Ohio; and (4) Mr. Donald J. Woods, a former Compliance Manager at UPS. UPS produced three witnesses in support of its case: (1) again, Mr. Woods; (2) Mr. Norman T. Schenk, Vice President of Brokerage Services at UPS; and (3) Mr. Joe Welch, UPS's former Manager for Training and Customs Compliance. This Court finds the testimony of all witnesses credible and thus probative of the issues in dispute.

Both Customs and UPS introduced at trial documents relating to several categories: (1) the relevant penalty actions and the entries at issue in this litigation; (2) the use of convenience classifications generally and 30.90 in particular; (3) training and education efforts by both Customs and UPS concerning the use of 30.90; (4) Customs's warning letters to UPS concerning its use of 30.90; and (5) internal UPS communications regarding the same. The Court finds this documentary evidence highly probative because it provides contemporaneous accounts of events related to

---

[5](...continued)
on consent, for leave to file a corrected post-trial brief in order to withdraw the particular arguments that were the subject of UPS's letter of February 14, 2008. This Court granted that request on May 28, 2008, and substituted Customs's corrected post-trial brief for its initially-filed post-trial brief.

Customs efforts to increase compliance under 30.90, including training, UPS's responses, and the eventual imposition of the penalty actions in this case.

In accordance with USCIT Rule 52(a), and having given due consideration to the testimony of all six witnesses and documentary evidence presented and admitted by the Court at trial, and for the reasons that follow, the Court enters judgment in favor of Customs pursuant to the following stipulated facts, findings of fact, and conclusions of law.

The Opinion proceeds as follows. Part II sets out the Jurisdiction and Standard of Review. Part III contains the Agreed Facts, as jointly stipulated to by the parties, and Part IV contains the Court's Findings of Fact. Part V contains the Court's Conclusions of Law, and Part VI provides for the eventual entry of judgment pursuant to USCIT Rule 58.

## II.     Jurisdiction & Standard of Review

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1582(1) (2000).

The Court reviews a case brought under 19 U.S.C. § 1641(d)(2)(A) de novo as to the facts, the law, and the amount of the penalty. 28 U.S.C. § 2640 (2000); United States v. Ricci, 21 CIT 1145, 1146, 985 F. Supp. 125, 126 (1997).

Applying this standard to the material facts in dispute in the instant case, Customs has the burden to establish that the particular entries at issue here do not

contain a CRT.[6] The parties have stipulated that the merchandise in 37 of the 45 entries at issue in this case do not contain a CRT . (See Agreed Facts ¶ 7, infra.) Three of the remaining eight disputed entries were withdrawn by Customs at trial. (See note 8, infra.) Therefore, Customs need only present evidence that the remaining five entries do not contain a CRT. (See Agreed Facts ¶ 8, infra.)

III.   **Agreed Facts**

The parties jointly agreed to the following facts before and during trial:

1. At all times relevant to the matters that are the subject of this action, UPS was a licensed customs broker doing business in Louisville, Kentucky.

2. UPS was the broker of record for the entries that are the subject of this action.

3. A cathode-ray tube ("CRT") is a glass vacuum tube that produces light or images and can serve as a display on a monitor or television.

4. Between January 10 and May 10, 2000, UPS filed with Customs in the Port of Louisville, 60 entries of merchandise under 30.90 that became the subject of penalty case numbers 2000-4196-300217, -300218, -300219, -300221, -300222, -300223, -300319, and -300320.

---

[6]Because Customs's allegation of misclassification is central to its case that UPS did not exercise responsible supervision and control, if Customs does not meet its burden regarding the absence of CRT's in the merchandise, and therefore fails to establish that the merchandise was misclassified, its conclusion that UPS violated the responsible supervision and control provision of section 1641 would be "unwarranted by the facts before the court." See 5 U.S.C. § 706(2)(F).

5. Beginning May 15, 2000, Customs initiated 8 penalty actions against UPS covering the 60 entries referenced in Agreed Facts, ¶ 4, as follows:

A.    May 15, 2000: Three Penalty Actions under cases -300217 ($5,000), -300218 ($5,000), and -300219 ($5,000).

B.    July 11, 2000: Three Penalty Actions under cases -300221 ($5,000), -300222 ($5,000) and -300223 ($5,000).

C.    August 15, 2000: Two Penalty Actions under cases -300319 ($30,000) and -300320 ($30,000).

6. UPS paid $15,000 for the three penalty actions initiated on May 15, 2000.[7] The remaining five penalty actions, penalty case numbers 2000-4196-300221, -300222, -300223, -300319, and -300320, comprising 45 of the original total of 60 entries, and representing $75,000 in assessed uncollected penalties, are the subject of the amended complaint filed in this action.

7. In advance of trial, the parties stipulated that the following 37 entries (out of 45 entries) of merchandise, entered under 30.90, did not contain a CRT:

---

[7]At trial the Customs offered evidence pertaining to the 15 entries associated with the penalty actions under cases -300217, -300218, and -300219 "in an abundance of caution" with no objection from the UPS since they "think [those penalty actions are] part of this case." (Trial Transcript ("Tr.") 6–7.) Notwithstanding, the Court need not address these 15 entries as such since they were not subject of Customs's Amended Complaint. (See also Tr. 266-67.)

| Chart 1: Stipulation – 37 Entries: Merchandise Contained No CRT | | | |
|---|---|---|---|
| Penalty Action Date | Penalty Action Number | Entry Date | Entry Nos. |
| July 11, 2000 [Pre-penalty Notices] September 26, 2000 [Penalty Notices] | 2000-4196-300221 | 1-10-00 | 582-0152166-2 |
| | | 1-20-00 | 582-0164486-0 |
| | | 1-23-00 | 582-0165993-4 |
| | 2000-4196-300222 | 1-22-00 | 582-0166770-5 |
| | | 1-23-00 | 582-0166776-2 |
| | | 1-24-00 | 582-0168407-2 |
| | | 1-25-00 | 582-0168646-5 |
| | | 1-25-00 | 582-0168649-9 |
| | 2000-4196-300223 | 1-28-00 | 582-0173091-7 |
| | | 2-2-00 | 582-0178807-1 |
| | | 2-11-00 | 582-0190127-8 |
| | | 2-15-00 | 582-0193413-9 |
| August 8, 2000 [Pre-penalty Notices] October 19, 2000 [Penalty Notices] | 2000-4196-300319 | 3-20-00 | 582-0235856-9 |
| | | 3-24-00 | 582-0242329-8 |
| | | 3-24-00 | 582-0242341-3 |
| | | 3-29-00 | 582-0248249-2 |
| | | 4-3-00 | 582-0252891-4 |
| | | 4-6-00 | 582-0258379-4 |
| | | 4-6-00 | 582-0258099-8 |
| | | 4-6-00 | 582-0258552-6 |
| | | 4-7-00 | 582-0259972-5 |
| | | 4-12-00 | 582-0266194-7 |
| | | 4-13-00 | 582-0266658-1 |
| | | 4-18-00 | 582-0272385-3 |
| | | 4-19-00 | 582-0273885-1 |
| | 2000-4196-300320 | 4-20-00 | 582-0275794-3 |
| | | 4-20-00 | 582-0276456-8 |
| | | 4-21-00 | 582-0278391-5 |

| Chart 1: Stipulation – 37 Entries: Merchandise Contained No CRT | | | |
|---|---|---|---|
| Penalty Action Date | Penalty Action Number | Entry Date | Entry Nos. |
| | | 4-21-00 | 582-0278099-4 |
| | | 4-21-00 | 582-0276683-7 |
| | | 4-25-00 | 582-0279974-7 |
| | | 5-3-00 | 582-0289733-5 |
| | | 5-3-00 | 582-0290367-9 |
| | | 5-4-00 | 582-0291357-9 |
| | | 5-4-00 | 582-0291150-8 |
| | | 5-4-00 | 582-0292552-4 |
| | | 5-4-00 | 582-0292853-6 |

8. The parties stipulated that there exists a factual dispute over whether the following five entries[8] of merchandise, entered under 30.90, contained a CRT:

| Chart 2: Dispute – Did these 5 entries include a CRT? | | | |
|---|---|---|---|
| Penalty Action Date | Penalty Action No. | Entry Date | Entry Nos. |
| July 11, 2000 [Pre-penalty Notices] | 2000-4196-300221 | 1-16-00 | 582-0157461-2 |
| September 26, 2000 [Penalty Notices] | 2000-4196-300223 | 2-10-00 | 582-0188677-6 |
| August 8, 2000 [Pre-penalty Notices] | 2000-4196-300319 | 3-28-00 | 582-0245010-1 |
| October 19, 2000 [Penalty Notices] | | 4-9-00 | 582-0261334-4 |
| | 2000-4196-300320 | 5-9-00 | 582-0298398-6 |

---

[8]Customs withdrew evidence pertaining to three entries since the supporting documents were inadvertently not disclosed to UPS prior to trial. (See Tr. 277-82:7, 295-97.) The entries are: entry number 582-0165996-7 [dated Jan. 1, 2000, penalty action 2000-4196-300221]; entry number 582-0276226-5 [dated Apr. 20, 2000, penalty action 2000-4196-300320 ]; and entry number 582-0276220-8 [dated Apr. 20, 2000, penalty action 2000-4196-300320 ]. (Exs. 19, 45, & 46.) Consequently, Customs did not meet its burden to show that these three entries were misclassified.

(PTO, Schedules C and C'; Tr. 34-35, 265-66; Exhibits ("Exs.")[9] 16, 27, 33, 40, & 59.)

## IV.   Findings of Fact

The Court makes the following findings of fact based on the testimony and

evidence presented at trial, and the Agreed Facts adopted by the parties:

1. UPS is an express consignment operator ("ECO")[10] responsible for preparing

and filing customs entry documents on behalf of its clients and has been a licensed

customs broker since 1985. (See First Am. Compl. ¶ 3; Answer ¶ 3; PTO, Schedule C, ¶

1; Tr. 59:8-15, 671-72, 679-81.)

2. UPS operated at six different "hub" cities, with the largest hub being at

Louisville, Kentucky. (Tr. 498-99.)

3. UPS considered itself to be in a "partnership" with Customs so that as issues

arose, both positive and negative, courtesy telephone calls would be generated at the

highest levels of management in order to address issues and devise appropriate

response plans in a spirit of cooperation. (Tr. 704-10, 733-35, 740-42, 809.)

---

[9]Customs's trial exhibits are designated by numbers, whereas UPS's trial exhibits are designated by letter.

[10]Customs regulations define an "express consignment operator or carrier" as "an entity operating in any mode or intermodally moving cargo by special express commercial service under closely integrated administrative control. Its services are offered to the public under advertised, reliable timely delivery on a door-to-door basis. An express consignment operator assumes liability to Customs for the articles in the same manner as if it is the sole carrier." 19 C.F.R. § 128.1(a) (2006).

4. In the period January through May 2000, UPS made approximately 2,900–3,900 Customs entries per day at its Louisville facility totaling approximately 375,000 entries for this period. (Tr. 569-70, 569-70.)

5. During this same period, UPS made Customs entries of "thousands" of computer parts and accessories. (Tr. 633-34.)

6. Beginning around 1995, Customs instituted a compliance measurement program in order to assess and improve Customs's compliance figures as measured against merchandise entry summaries. Entry summaries are filed by importers and brokers ten days following the release of merchandise, when duties are deposited. (Tr. 94-97.)

7. Customs headquarters determined that certain industries would be designated as "primary focus industries" pursuant to the compliance measurement program. In Mr. Piedmont's commodity team, the communications industry was the primary focus industry that was concentrated upon. (Tr. 95-100; 114.)

8. Particularly, Customs decided to narrow the focus on the communications industry's compliance rates for merchandise entered under HTSUS heading 8473. Customs determined that subheading 8473.30.9000 had extremely low compliance rates. In fact, merchandise classified with subheading 8473.30.9000 was classified "99% of the time in error." (Tr. 171-72, 179, 207, 244; Ex. 114 at 5.) Customs partially attributed the industry's low compliance rate for subheading 8473.30.9000 to its use as a "convenience

classification" or "basket provision" in that through its use by brokers or importers, the release of merchandise could be obtained from Customs without the broker determining what in fact was the correct classification. (Tr. 93-94, 114, 121-22, 125, 178-80, 182, 207, 240-41, 243-44, 368-69, 854-57; Exs. 113, 114 at 5.)

9. Customs notified various members of the trade community, including UPS, not to use convenience classifications. Particularly, on April 3, 1996, Customs issued a memorandum to importers and brokers doing business at the port—called a "port pipeline"—notifying all interested parties that the use of convenience classifications was prohibited. (Ex. 89; Tr. 91-94, 175-83, 850-57.)

10. Customs considers proper classification of merchandise important and not limited to revenue purposes, but also for maintenance of accurate trade statistics. (Tr. 218-20, 923-14.) The rate of duty for 30.90 is "free" or 0% ad valorem.

11. As part of its compliance efforts, Customs provided training sessions to the industry. Particularly, between September 9 and 11, 1997, Customs at the Port of Cleveland, provided training to UPS at a "Train-the-Trainer" program, where, in addition to instruction, educational materials were distributed to all participants. (Exs. A, 99-102, 108; Tr. 86-91, 128-35, 866-68.)

12. Customs presented a variety of topics at the "Train-the-Trainer" program, which was attended by UPS personnel, including instruction on section and chapter

notes to Chapters 84 and 85 of the HTSUS and seven different tariff headings including heading HTSUS 8473. (Exs. A, 99-101; Tr. 86-91, 128-35, 187-88, 866-68.)

13. Specifically discussed at the "Train-the-Trainer" program were what Customs termed "areas of concern" and "discrepancies within particular HTS numbers." (Ex. 106.)

14. Customs's instructors and materials drew attention to HTSUS Chapter 84, particularly 30.90. Participants were instructed that "[a]ll of the items under these numbers must contain a cathode ray tube . . . . These numbers should almost never be used. Using 8473.30.9000 sends up the red flag to Customs to look at that entry — it is usually never correct!!!" (Ex. 108 p. 34 (emphasis in original); Tr. 136-38.)

15. UPS represented to Customs by letter that it had participated in the "Train-the-Trainer" program and received instruction on Customs's areas of concern, including HTSUS heading 8473. (Ex. 104.) Beginning in late September 1997 and continuing into 1998, UPS developed a compliance plan that featured the seven tariff headings highlighted at the "Train-the-Trainer" program, including heading HTSUS 8473. (Ex. B; Tr. 600-03.) UPS continued with these efforts over the subsequent months, which manifested itself in the form of additional internal UPS compliance and commodity training for classification personnel and the creation of a new position dedicated to training. (Exs. E, F; Tr. 537, 600-03.)

16. In a letter dated October 8, 1997, Customs notified UPS of its compliance rate for various tariff headings including heading HTSUS 8473, which was 54.35%. (Ex. 103.) One year later, Customs revised UPS's 1997 compliance rate for heading HTSUS 8473 to 59.52%. (Ex. AA.) Additionally, Customs apprised UPS that heading HTSUS 8473 was receiving "heightened scrutiny" by the Bureau. (Exs. 103, AA.)

17. Subsequently, in a December 22, 1997 letter, UPS notified Customs of its compliance training efforts, which "emphasized the importance of the accurate use of the tariff numbers under these headings," and "provided [approximately 100 of] its rating group [personnel] with detailed information as to invoice requirements and the need for customer follow-up when invoices are deficient." (Ex. 107.)

18. Again, on February 12, 1998, UPS informed Customs by letter of its compliance training efforts, including further training and hiring additional compliance personnel. (Ex. 109.)

19. Customs conducted an on-site visit to UPS's Louisville, Kentucky facility on February 17-18, 1998 and among the issues discussed were UPS's "compliance rates of HTSUS 8471 and 8473." (Exs. 110-12.)

20. Notwithstanding efforts by UPS to improve its compliance rates through training and other means, its misclassification of merchandise under 30.90 continued. (Exs. 84-86, 90; Tr. 251-56.)

21. Between September 1997 and May 1998, Customs had notified UPS on multiple occasions about the improper use of 30.90 through its training efforts, Notices of Action (a.k.a. Customs Form 29 (CF-29)), and phone calls between its Import Specialists and UPS personnel. On May 6, 1998, Customs issued a warning letter to UPS "strongly suggesting" that UPS review the types of merchandise classifiable under 30.90. Customs explained that UPS "consistently used this particular HTS[US] number . . . when in fact, Customs has informed [UPS] that this HTS[US] number should rarely be used, unless it is for 'parts of ADP[11], incorporating a cathode ray tube.'" (Exs. 84-86, 90, 92-98, 100-01, 103-116, H, I; Tr. 247, 256-57, 878-79.)

22. On or about May 19, 1998, UPS finally decided, on its own accord and as a failsafe measure, to remove the tariff number 30.90 from UPS's electronic data file (the "tariff tape"), which contained the entire HTSUS, in order to physically prevent its use and thus eliminate potential misclassifications. (Ex. I; Tr. 477-78, 509-10.) Along with personnel training endeavors, UPS substantially relied on the removal of tariff number 30.90 from the tariff tape as its principle means of maintaining compliance.

23. Tariff tape revisions were provided to UPS by Customs twice a year—typically each January and July. Removal of the tariff number 30.90 from the UPS tariff tape was conducted by UPS computer systems personnel and needed to

---

[11]An "ADP" is an "automated data processing machine," i.e., a computer. HTSUS heading 8471.

occur each time a new tariff tape was issued, so long as UPS wanted to physically

prevent its employees from using the 30.90 tariff subheading. (Tr. 510-11, 521, 608-09.)

24. UPS continued to remove 30.90 from the tariff tape through the second half

of 1998 and continuously through 1999. UPS had informed Customs that it had

removed the 30.90 tariff number from its tariff tape so that its "classification specialist[s

could] . . . not use it without further investigation as to whether the merchandise

contains a [CRT] or not." (Ex. CC.)

25. Though UPS had removed 30.90 from the tariff tape, it could nevertheless be

"manually" entered by a UPS classification specialist, following a review of the

commercial invoice and upon receiving the appropriate supervisory and technical

approvals. In the "rare" case where the importer "insisted" that 30.90 was the

appropriate subheading, following UPS supervisory scrutiny and vetting, UPS would

then manually enter it under this tariff number. (Tr. 513-14, 544-48, 555-56, 595-98.)

26. Through the first three quarters of FY 1998, UPS had improved its

compliance rate for heading HTSUS 8473 to an unweighted[12] 80.00%. (Ex. AA.) In FY

1998, the national average compliance rate for heading HTSUS 8473 for ECOs was 65%

(Ex. 113; Tr. 201-05.)

27. In a December 3, 1998 letter, the Cleveland Port Director for Customs's John

M. Regan, acknowledged to Norm Schenk, UPS, that UPS had participated in training

_____

[12]That the reported compliance rate was "unweighted" would only account for a
variance of 1–2% at most. (Tr. 212.)

and problem solving sessions with Customs. The letter reflected upon the notion that such participation improved the communications between UPS and Customs. (Ex. K; Tr. 703-04.)

28. Between mid-1998 through the end of 1999, there were no entries made by UPS that were the subject of any Customs Notices of Action involving the use of 30.90. (Tr. 927-28.) However, there were several entries during this period that had been improperly classified utilizing the tariff number 30.90. (Exs. 86-88; Tr. 258-59.)

29. On September 21, 1999, Customs announced a new nationwide initiative directed at ECOs, called the Multi-port Approach to Raise Compliance, or "MARC 2000." Customs noted that ECOs generally had maintained a 65% compliance rate for heading 8473 in 1999, and set as its goal 89% compliance by 2000, and 95% by 2004.

30. Customs conducted formal training under the aegis of MARC 2000, as well as other informal sessions. Again, UPS participated and was instructed on the proper use of 30.90, which is to say, UPS was instructed not to use it. (Exs. 91, 110-14, M, O; Tr. 85-87, 623-24, 872-74.)

31. Testimony by Messrs. Welch and Woods explained that though UPS had, by plan, been removing 30.90 from its tariff tape, with the latest revision in the HTSUS in January 2000, UPS had failed to execute the removal of 30.90 from the tariff tape, and continued not to do so until at least the end of May 2000. (Tr. 520-22, 544-56, 560-61, 563-65, 603-13.)

32. On January 31, 2000, Customs issued a second warning letter to UPS concerning the misuse of 30.90, stressing that "Customs is paying close attention to those filers/importers who do not fulfill their legal obligations in the preparation, research and submission of Customs entries. Frequent or repetitive errors . . . will be met with appropriate action." (Ex. 91; Tr. 884-85.)

33. UPS never communicated to Customs that 30.90 was confusing or ambiguous, nor sought a binding ruling regarding this subheading, nor filed a protest. (Tr. 727-735, 820-21, 883-84.) UPS now claims, however, that it did not agree with Customs's interpretation of 30.90. The company maintains that it did not file a protest because of its "gentlemen's agreement," that existed between UPS and Customs whereby UPS orally agreed that it would not file a protest where there was no duty or where the duty was $100 or less. (Tr. 730-33, 735.)

34. Between January 10, 2000 and May 10, 2000, UPS filed 60 entries in the Port of Louisville under 30.90 that formed the subject of several Notices of Action. (Agreed Facts, ¶ 4.)

35. UPS has stipulated that all but 8 of the 45 entries in this lawsuit did not contain a CRT. (Cf. Charts 1 & 2, supra; Tr. 268.) Following Customs's withdrawal of evidence pertaining to 3 entries, there remained a factual dispute as to whether the remaining 5 entries (see Chart 2) contained CRTs.

36. Customs Import Specialist Moosebrugger testified that, based his experience and familiarity with these imported electronic goods, the disputed remaining 5 entries did not contain CRTs. This Court finds Moosebrugger a highly credible witness and along with the documentary evidence, finds, by a preponderance of the evidence, that:

a. Entry 582-0157461-2 did not contain a CRT. This entry is for a UP 2030 stencil printer that is used to print solder paste onto printed circuit boards in assemblies when manufacturing them. The UP 2030 printer is neither a part nor accessory of an automated data processing machine, nor does it contain a CRT. (Ex. 16; Tr. 271-75.)

b. Entry 582-0188677-6 did not contain a CRT. This entry is for security key swiping equipment, which is neither a part nor accessory of an ADP, nor does it contain a CRT. (Ex. 27; Tr. 283-88.)

c. Entry 582-0245010-1 did not contain a CRT. This entry is for an industrial computer with a liquid crystal display ("LCD") unit. An LCD unit does not contain a CRT. This merchandise, while an ADP, is neither a part nor accessory containing a CRT. (Ex. 33; Tr. 289-93.)

d. Entry 582-0261334-4 did not contain a CRT. This entry is for an industrial computer with a flat panel LCD display unit, which does not contain a CRT. (Ex. 40; Tr. 293-94.)

e. Entry 582-0298398-6 did not contain a CRT. The entry documents vaguely describe the item at issue as a "computer accessory." However, the entry quantity on the commercial invoice states 80 units, and the unit cost per item is $2.60. The stated cost for this quantity and weight "would not be consistent with normal practices or cost practices" for a CRT. (Ex. 59; Tr. 297-301.)

37. Customs decided that, as customs broker, UPS was responsible for the misclassifications, as opposed to the various importers of record, since UPS had been warned before and subsequently received training with respect to 30.90. (Tr. 886-91.)

38. The pre-penalty notices for all eight penalty actions each alleged violations of the responsible supervision and control provision of the broker statute as a result of the erroneous classification of particular entries of merchandise specified in each prepenalty notice. (Exs. 60, 61, 63, 65, 67, 69, 71 and 73; Tr. 960.)

39. Prior to the May 15, 2000 penalty actions, UPS had not been the subject of any penalty action involving an alleged failure to exercise responsible supervision and control in over 15 years of operation as a licensed customs broker. (Tr. 828.)

40. Every entry that comprised penalty case numbers 2000-4196-300221, -300222, -300223, -300319, and -300320, had been filed by UPS between January 10, 2000 and May 10, 2000 at the Port of Louisville, Kentucky. (Agreed Facts, ¶ 4.)

41. Customs at the Port of Louisville, Kentucky packaged and shipped the entry papers to the Area Port of Cleveland, Ohio for an import specialist review to determine whether the classification employed by UPS was used correctly. Due to what this Court will term "bureaucratic lag," the Port of Cleveland did not receive these entry papers for nearly 1½ to 2 months following entry of the merchandise. (Tr. 995-97.)

42. Customs's Import Specialist Team at the Port of Cleveland decided that each time a misclassified entry by UPS was discovered, it would be collected, and when Customs collected five misclassified entries, the entries would be bundled together, and referred to Customs's Office of Fines, Penalties and Forfeitures ("FP&F"), which then

would issue a single administrative penalty notice to UPS.[13] (Tr. 995-96, 892-93, 901, 940-41, 962-63, 1000-01, 1006.)

43. An FP&F supervisor, along with input from the Import Specialist Team, had devised a plan: for the initial penalties, the penalty notices would be issued at $5,000 each based upon relevant sections of the mitigation guidelines (see generally 19 C.F.R. Pt. 171, App. C.). The recommended penalty amount would then be increased to $10,000 for subsequent referrals. (Tr. 886-93, 899-907, 1004-05, 1009-10, 1013-14.)

44. Customs's plan with respect to UPS, described above, as devised and executed was not intended to circumvent the statutory cap of $30,000 for each penalty, per 19 U.S.C. § 1641(d)(2)(A). (Tr. 1009-1018.)

45. In executing this plan, Customs issued, on May 15, 2000, three pre-penalty notices of $5,000 each, which were each separately based upon five misclassified entries received seriatim, as filed by UPS under 30.90:

| Chart 3: Assessment of Fines & Dispositions | | | |
|---|---|---|---|
| Penalty Action Date | Penalty Action Number | Imposed Fine | Disposition |
| May 15, 2000 [Pre-penalty Notices] | 2000-4196-300217 | $5,000 | Fine paid by UPS |
| | 2000-4196-300218 | $5,000 | Fine paid by UPS |
| September 15, 2000 [Penalty Notices] | 2000-4196-300219 | $5,000 | Fine paid by UPS |

[13]The broker statute requires that Customs notify a broker prior to enforcing a penalty against it for a violation of the statute. 19 U.S.C. § 1641(d)(2)(A).

After considering UPS's pre-penalty response, Customs issued three penalty notices, assessing a $5,000 fine in each penalty action. These fines were paid and are not a part of this action. (Exs. 60, 61; Tr. 6–7, 266-67.)

46. On July 11, 2000, Customs initiated three additional $5,000 penalty actions and on August 8, 2000, two $30,000 penalty actions were initiated:

| Chart 4: Assessment of Fines & Dispositions | | | |
|---|---|---|---|
| Penalty Action Date | Penalty Action Number | Imposed Fine | Disposition |
| July 11, 2000 [Pre-penalty Notices] September 26, 2000 [Penalty Notices] | 2000-4196-300221 | $5,000 | Not Paid; Subject of Amended Complaint |
| | 2000-4196-300222 | $5,000 | Not Paid; Subject of Amended Complaint |
| | 2000-4196-300223 | $5,000 | Not Paid; Subject of Amended Complaint |
| August 8, 2000 [Pre-penalty Notices] | 2000-4196-300319 | $30,000 | Not Paid; Subject of Amended Complaint |
| October 19, 2000 [Penalty Notices] | 2000-4196-300320 | $30,000 | Not Paid; Subject of Amended Complaint |

(Exs. 65, 67, 69, 71, 73.) Each $5,000 penalty action was based upon five misclassified entries, as they accumulated, following which each $30,000 penalty case was based on fifteen misclassified entries, as they thereafter accumulated. (Id.; see also Agreed Facts ¶ 5; PTO, Schedule C'; Charts 1–4, supra.) After considering UPS's pre-penalty responses, Customs issued penalty notices dated September 26, 2000 and October 19, 2000, respectively, for a total amount of $75,000 in penalties. (Exs. 66, 68, 70, 72, 74.)

47. UPS failed to remit the $75,000 in penalties imposed by the September 26 and October 19, 2000, penalty notices. On December 17, 2004, Customs commenced this

action against UPS seeking to enforce the monetary penalties Customs imposed on UPS. (Amd. Compl. ¶¶ 14, 21, 24, 27, 30, 33.)

### V. Conclusions of Law[14]

#### A. *Classification Under HTSUS subheading 8473.30.9000 ("30.90")*

Because the justification by Customs for the penalties it issued to UPS was that the company continually misclassified merchandise by improperly using subheading 30.90, the first question of law presented by the case is whether UPS, in fact, misclassified merchandise that formed the basis for the challenged penalties by Customs.[15] As Customs concedes, if UPS did not misclassify the entries at issue then there would be no basis for the penalty claims in this case. (Tr. 960-61.) (See Agreed Facts ¶ 7; Finding of Facts ¶ 37.)

Customs's classification decisions are reviewed through a two-step analysis—first construing the relevant tariff headings, then determining under which of those headings the merchandise at issue is properly classified. Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citing Universal Elecs., Inc. v. United

---

[14]If any of these Conclusions of Law shall more properly be Findings of Fact, they shall be deemed to be so.

[15]The Court, in classification cases, has an independent obligation to ascertain the proper classification of merchandise in dispute. See Jarvis Clark Co. v. United States, 733 F.2d 873, 876 (Fed. Cir. 1984); Simon Mktg., Inc. v. United States, 29 CIT __, __, 395 F. Supp. 2d 1280, 1286 (2005). "[T]he Court must determine 'whether the government's classification is correct, both independently and in comparison with the [broker's] alternative.'" Cargill, Inc. v. United States, 28 CIT 401, 408, 318 F. Supp. 2d 1279, 1287 (2004) (quoting Jarvis Clark, 733 F.2d. at 878).

States, 112 F.3d 488, 491 (Fed. Cir. 1997)). Determining the proper meaning of the relevant tariff headings is a question of law, while application of the terms to the merchandise is a question of fact. Id.

When construing tariff terms, the Court may look to common and commercial meanings if such construction would not contravene legislative intent. JVC Co. of Am. v. United States, 234 F.3d 1348, 1352 (Fed. Cir. 2000). To ascertain the common meaning of a tariff term, the Court may refer to dictionaries, scientific authorities, and similarly reliable resources. Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002). The Court may also look to the explanatory notes for guidance. Motorola, Inc. v. United States, 436 F.3d 1357, 1361 (Fed. Cir. 2006) (noting that explanatory notes are "instructive, but not binding").

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "A classification analysis begins, as it must, with the language of the headings." Id. at 1440.

In pertinent part, the HTSUS General Rule of Interpretation ("GRI") 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS (2000). In fact, "Section and Chapter

Notes are not optional interpretive rules, but are statutory law, codified at 19 U.S.C.

§ 1202." Park B. Smith, Ltd. v. United States, 347 F.3d 922, 926 (Fed. Cir. 2003) (citing

Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999)).  The GRIs are applied

in numerical order.  See ABB, Inc. v. United States, 421 F.3d 1274, 1276 n.4 (Fed. Cir.

2005) (citing Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).

To apply GRI 1, the Court must construe "the language of the heading, and any

section or chapter notes in question, to determine whether the product at issue is

classifiable under the heading."  Orlando Food, 140 F.3d at 1440.  The Court must

identify the proper heading or headings in which an article is classifiable before it can

determine the subheading that provides the classification for the item.  Id.

As explained below this Court holds as a matter of law that, by operation of GRI

1, for merchandise to be classified under HTSUS subheading 8473.30.9000, the imported

article must contain a CRT.  This Court grounds its conclusion in the text of the tariff, its

organization, and from the plain meaning of the tariff language.  See Pillowtex Corp. v.

United States, 171 F.3d 1370, 1373 (Fed. Cir. 1999) ("It is a general rule of statutory

construction that where Congress has clearly stated its intent in the language of a

statute, a court should not inquire further into the meaning of the statute.") (citation

omitted).

The Court first looks to the terms of the heading.  Heading 8473 covers "[p]arts

and accessories" of certain "machines of headings 8469 to 8472," which are defined

elsewhere in the tariff code. HTSUS 8473 (2000). Heading 8469 covers "[t]ypewriters other than printers." HTSUS 8469 (2000). Heading 8470 covers "[c]alculating machines and pocket-size data recording, reproducing and displaying machines with calculating functions; accounting machines, postage-franking machines, ticket-issuing machines and similar machines, incorporating a calculating device; cash registers." HTSUS 8470 (2000). Heading 8471 covers "[a]utomatic data processing machines . . . ; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data." HTSUS 8471 (2000). Finally, heading 8472 covers "[o]ther office machines (for example, hectograph or stencil duplicating machines, addressing machines, automatic banknote dispensers, coin-sorting machines, coin-counting or wrapping machines, pencil-sharpening machines, perforating or stapling machines)." HTSUS 8472 (2000).

The scope of heading 8473 as such, is a "parts and accessories" provision; it does not pertain to the wholly assembled articles. Specifically, heading 8473 pertains to the parts and accessories of typewriters, calculating machines, office machines and computers, but not the computers themselves, as they are classifiable under the more specific tariff heading 8471. This interpretation is supported by the plain language and structure of the tariff schedule for heading 8473. Specific characteristics or qualities of merchandise are described under the tariff schedule label "article description."

Subheading 8473.30 is specifically reserved for "[p]arts and accessories of the machines of heading 8471." As stated above, heading 8471 covers "[a]utomatic data processing machines" ("ADPs")—i.e., computers.[16] Thus, in order for merchandise to be classified under subheading 8473.30, the item would have to meet three requirements: (i) that the item is a part or accessory (ii) of an ADP, as defined by 8471 and note 5, Chapter 84 HTSUS, and (iii) that the item is either a part or accessory of an ADP.

Subheading 8473.30 breaks out further into additional differentiated subcategories:

| | | |
|---|---|---|
| 8473.30 | Parts and accessories of the machines of heading 8471: | |
| | Not incorporating a cathode ray tube: | |
| 8473.30.1000 | Printed circuit assemblies | |
| 8473.30.2000 | Parts and accessories, including face plates and lock latches, of printed circuit assemblies | |
| 847.30.3000 | Other parts for printers, specified in additional U.S. note 2 to this chapter | |
| 8473.30.5000 | Other | |
| | Other: | |
| 8473.30.6000 | Other parts for printers, specified in additional U.S. note 2 to this chapter | |
| 8473.30.9000 | Other | |

The articles described in subheadings 8473.30.1000 through 8473.30.5000 can not contain CRTs, as CRTs are explicitly excluded by the language "[n]ot incorporating a cathode ray tube."

---

[16]Heading 8471 is for "[a]utomatic data processing machines ["ADPs"] and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included." HTSUS 8471 (2000).

Conversely, articles described in subheadings 8473.30.6000 and

8473.30.9000—which subheadings fall under the "[o]ther" article description—must

contain a CRT. Provisions such as subheadings 8473.30.6000 and 8473.30.9000 are

known as "basket" or "residual" provisions. See, e.g., EM Indus., Inc. v. United States,

22 CIT 156, 165, 999 F. Supp. 1473, 1480 (1998) ("'Basket' or residual provisions of

HTSUS Headings . . . are intended as a broad catch-all to encompass the classification of

articles for which there is no more specifically applicable subheading."). As such, these

residual subheadings encompass all "[o]ther" articles that fall within subheading

8473.30, but which are not classifiable under the more specific provision, i.e., ADP parts

incorporating a CRT. Specifically, subheading 8473.30.6000 is reserved for printer

parts[17] that contain a CRT and 8473.30.9000 is reserved for ADP parts that contain a

CRT.

Customs argues that in order for merchandise to be classified under subheading

8473.30.9000, the items must be: (i) parts or accessories; (ii) of an ADP; (iii) that contain a

CRT. Should an article fail to meet any of these perquisites, it could not be classified

_____

[17]Subheadings 8473.30.3000 and 8473.30.6000 are reserved for "[o]ther parts for printers" that are specified in Additional U.S. note 2 to Chapter 84. Additional note 2, Chapter 84, lists an array of printer parts of ADP machines described in subheading 8471.60. Subheading 8471.60 describes "[i]nput or output units" of ADP machines, i.e., stand-alone printers. Subheading 8471.60 breaks out this tariff, in part, by whether it has a CRT or not. Thus, based on the structure and the language of this tariff, the drafters clearly contemplated that there were parts of printers that contained CRTs.

under subheading 8473.30.9000. (Ex.117; Tr. 223-226, 410-11, 414, 427-28; Pl.'s Post-Trial Br. 2 ¶4.)

UPS argues that the limitation under subheading 8473.30 "[n]ot incorporating a CRT" only applies to the ADP <u>machine</u>, defined under heading 8471, and not the individual part. Therefore, they argue, that the parts and accessories imported under subheadings 8473.30.6000 and 8473.30.9000 need not themselves contain CRTs, but merely the assembled whole need contain CRTs. (Exs.117, NN; Tr.415, 427-28; Def.'s Post-Trial Br. 3 ¶4.) The nub of UPS's textual argument is that under subheading 8473.30, the phrase "[n]ot incorporating a cathode ray tube" immediately follows after the phrase "machines of heading 8471." Therefore "it is appropriate to read these phrases together, rather than read 'not incorporating a cathode ray tube' as modifying 'parts and accessories,' which appears earlier in 8473.30." (Def.'s Post-Trial Br. 3 ¶4(a); <u>see also</u> Tr. 775-781.)

UPS's preferred construction of the tariff, however, is in conflict with the plain language, grammar, punctuation, and organization of subheading 8473.30.9000.[18] First, as stated above, key among the factors to consider is that heading 8473 is a <u>parts</u> provision—the articles described thereunder are parts and accessories of ADP machines, and not the machines themselves. ADP machines are provided for under a

---

[18]In construing tariff terms, "the court may rely upon its own understanding, dictionaries and other reliable sources." <u>Medline Indus., Inc. v. United States</u>, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (<u>citing</u> <u>Marubeni Am. Corp. v. United States</u>, 35 F.3d 530 (Fed. Cir. 1994)).

different tariff heading: 8471. Therefore, when a characteristic is listed that subdivides

articles preliminarily falling into the "parts and accessories" heading, we would expect

that the characteristic would refer to the "part or accessory," not the machine that the

part goes into. Second, UPS is essentially advocating the use of the "last antecedent

rule" to buttress its preferred interpretation. Under the last antecedent rule, "a limiting

clause or phrase . . . should ordinarily be read as modifying only the noun or phrase

that it immediately follows." Barnhart v. Thomas, 540 U.S. 20, 26 (2003). However, to

read the tariff text as UPS urges, belies both common sense and grammar.[19] The main

clause of subheading 8473.30 provides: "Parts and accessories of the machines of

heading 8471." Immediately following this phrase, on the next line (and indented), is

the text "[n]ot incorporating a cathode ray tube." Returning to the first line of text, the

prepositional phrase "of the machines of heading 8471 [i.e., ADPs]" modifies "[p]arts

and accessories." The phrase "[n]ot incorporating a cathode ray tube" cannot be read

coherently to modify "machines of heading 8471 [ADPs]" since it is set off on a separate

line and indented. It is unreasonable to employ the "last antecedent rule" as UPS

advocates because, if the phrase "[n]ot incorporating a cathode ray tube" were

modifying ADP machines, the phrases would not be offset by paragraph structure or

separated by punctuation. Customs's interpretation is therefore more reasonable in

---

[19]See 2 LAWRENCE J. BOGARD, CUSTOMS LAW & ADMINISTRATION § 32.5, at ¶ 211
(3d ed. 2007) ("The grammatical rule of construction that a qualifying clause modifies
only its immediate antecedent has been held inapplicable where such a construction
would not be reasonable or in accord with legislative intent.").

light of the plain language and structure of the text. Finally, Congress drafted

subheading 8473.30.9000 employing the use of colons.[20] Under subheading

8473.30.9000, the colon introduces the categorical list of the ADP parts classifiable under

it according to whether those parts and accessories either incorporate a CRT (see, e.g.,

HTSUS 8473.30.6000) or do not incorporate a CRT (see, e.g., HTSUS 8473.30.1000). See

Bruckman v. United States, 435 F. Supp. 1219, 1222 (Cust. Ct. 1977) ("The colon of the

superior heading clearly represents, through punctuation, an attempt to show that each

provision under it is intended to be a specific elaboration of the superior heading."),

rev'd. on other grounds, 582 F.2d 622 (C.C.P.A. 1978). The interpretation advocated by

UPS makes no sense grammatically and would render the punctuation here useless.[21]

As such, UPS's construction is untenable.

Therefore, this Court holds that, as a matter of law, for articles to be properly

classifiable under subheading 8473.30.9000 the articles must: (i) be parts or accessories;

(ii) of an ADP machine; and (iii) those parts or accessories must incorporate a CRT.

---

[20]See THE CHICAGO MANUAL OF STYLE ¶ 6.63 (15th ed. 2003) ("A colon introduces an element or a series of elements illustrating or amplifying what has preceded the colon.").

[21]The Court presumes all statutory language serves a purpose, see Bailey v. United States, 516 U.S. 137, 145 (1995) ("'Judges should hesitate . . . to treat [as surplusage] statutory terms in any setting. . . .'") (bracketed text in original) (citation omitted); Application of Barker, 559 F.2d 588, 591-92 (C.C.P.A. 1977), cert. den., 434 U.S. 1064 (1978) ("As a principle of statutory construction, it is presumed that Congress did not use superfluous words.") (citation omitted).

Should an article fail to meet any of these prerequisites, it may not be classified under 30.90.

The Court observes the parties stipulated that 37 entries underlying the penalty actions contained no CRTs (see Chart 2, Agreed Facts ¶ 7), and having found by a preponderance of the evidence that 5 disputed entries contained no CRTs (see Findings of Fact ¶ 36), the Court concludes that the total of 42 entries at issue here were misclassified by UPS as a matter of law. (See Charts 1 & 2.). With respect to the 3 entries withdrawn by Customs at trial, see note 8, supra, Customs has not established that they were misclassified.

### B.   UPS's Failure to Exercise Responsible Supervision and Control Over its Brokerage Business Pursuant to 19 U.S.C. § 1641(b)(4)

The Court now turns to the principal issue to be decided: Whether UPS failed to exercise responsible supervision and control, in violation of 19 U.S.C. § 1641(b)(4), by repeatedly misclassifying imported merchandise under 30.90 when that merchandise did not contain CRTs. The Court must initially consider the question of what "responsible supervision and control" means in the context of a Customs brokerage business, and analyze it de novo in light of the evidence presented at trial.

The term "responsible supervision and control" is not defined by section 1641 of the broker penalty statute. When Congress enacted 19 U.S.C. § 1641(a),[22] it explicitly

---

[22]The cause of action here is section 1641(d)(2)(A) of title 19, U.S. Code, which provides that Customs "shall service notice in writing upon any customs broker why

(continued...)

delegated gap-filling authority to Customs. 19 U.S.C. § 1641(f) (2000). Pursuant to that

delegation, and after a period of notice and comment, Customs enacted regulations

defining, among other things, the term "responsible supervision and control." See 19

C.F.R. § 111.1 (2000).

The U.S. Supreme Court in United States v. Mead Corp., 533 U.S. 218 (2001),

instructs that when an agency acts pursuant to delegated authority, "the fruits of notice-

and-comment rulemaking" are entitled to Chevron deference. Mead Corp., 533 U.S. at

230 (referring to Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837

(1984)) (add'l citations omitted). Chevron, in turn, holds that courts should defer to an

agency's interpretation of an ambiguous statute when Congress has left a gap for the

agency to fill, so long as the gap-filling interpretation is reasonable. Chevron, 467 U.S.

at 843-44.

> Customs's regulations provide that "[r]esponsible supervision and control":
>
> means that degree of supervision and control necessary to ensure the
> proper transaction of the customs business of the broker, including actions
> necessary to ensure that an employee of a broker provides substantially
> the same quality of service in handling customs transactions that the
> broker is required to provide. While the determination of what is
> necessary to perform and maintain responsible supervision will vary
> depending upon the circumstances in each instance, factors which
> Customs will consider include, but are not limited to:

---

[22](...continued)
the broker should not be subject to a monetary penalty not to exceed $30,000 in total for
a violation or violations of this section." The provision Customs alleges UPS violated is
19 U.S.C. § 1641(b)(4), which requires that "[a] custom broker shall exercise reasonable
supervision and control over the customs business it conducts."

—the training required of employees of the broker;

—the issuance of written instructions and guidelines to employees of the broker;

—the volume of type of business of the broker;

—the reject rate for various customs transactions;

—the maintenance of current editions of the Customs Regulations, the [HTSUS], and Customs issuances;

—the availability of an individually licensed broker for necessary consultation with the employees of the broker;

—the frequency of supervisory visits of an individually licensed broker to another office of the broker that does not have a resident individually licensed broker;

—the frequency of audits and reviews by an individually licensed broker of the customs transactions handled by employees of the broker;

—the extent to which the individually licensed broker who qualifies the district permit is involved in the operation of the brokerage; and

—any circumstances which indicates that an individually licensed broker has a real interest in the operations of the broker.

19 C.F.R. § 111.1 (emphasis added).

The parties do not argue that the definition of "responsible supervision and control" under 19 C.F.R. § 111.1 is an unreasonable interpretation of the customs penalty broker statute. (Pl.'s Post-Trial Br. 11-15; Def.'s Post-Trial Br. 10-12.) Rather, what the parties do quibble over, is the application of the broker penalty statute and associated regulations to the facts presented in this matter. Customs argues that where "regulations [such as 19 C.F.R. § 111.1] consist of possible factors for consideration, it is left to Customs's discretion to weigh them as deemed appropriate." (Pl. Post-Trial Br. 16.) UPS argues that Customs failed to meet its burden of proof to show that UPS

"failed to exercise responsible supervision and control and specifically did not show that it was deficient in any of the factors listed in [19 C.F.R.] § 111.1." (Def.'s Post Tr. Br. 12.)

"[I]t is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts." Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) (citing Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). The rationale for this greater degree of deference accorded to an agency's interpretation of its own regulations, as compared with an agency's construction of a statute, is because in the former case, the agency is voicing its institutional intentions as opposed to the intentions of Congress. Cathedral Candle Co., 400 F.3d at 1363-64 (citing Am. Express Co. v. United States, 262 F.3d 1376, 1382-83 (Fed. Cir. 2001)). So great is this heightened deference that, "an agency's interpretation is given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Lee v. United States, 329 F.3d 817, 822 (Fed. Cir. 2003) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)).

At the outset, this Court holds that Customs's definition of "responsible supervision and control," as set forth in section 111.1, is reasonable.

The next question to answer is whether Customs established, by a preponderance of the evidence, that UPS failed to exercise responsible supervision and control, as the agency has reasonably defined that statutory term. UPS contends that it

did not breach its obligations under section 1641(b)(4), <u>ergo</u> it has exercised responsible

supervision over its brokerage business. UPS argues that section 111.1 requires

Customs to consider <u>all</u> ten factors listed under section 111.1 before determining

whether a broker was derelict in its duty to responsibly exercise supervision and control

over its customs brokerage business. (Def's Post Trial Br. 13-15.) As support for this

proposition, UPS cites to two administrative letter rulings stating that

> [u]nless each of the listed criteria in 19 C.F.R. [111.1]
> was considered and where appropriate, the apparent
> failure to meet a specific criterion . . . was analyzed, it
> would be improper for Customs to make a
> determination whether responsible supervision and
> control was being exercised.

U.S. Customs Admin. Ltr. Rul. HQ 225010 (Jul. 21, 1994), 1994 U.S. Custom HQ LEXIS

1645, at *7–*8; <u>see also</u> U.S. Customs Admin. Ltr. Rul. HQ 115005 (May 2, 2000), 2000

U.S. Custom HQ LEXIS 906, at *3–*6 (same). Customs responds that UPS's

interpretation is "unreasonabl[e]" since: (1) common sense and the plain language of

section 111.1 belies UPS's interpretation, and (2) UPS's reliance on the letter rulings is

"misplace[d]," as these rulings are, in fact, consistent with Customs's interpretation of

section 111.1. (Pl. Post-Trial Br. 21-22.) The Government instead interprets the factors

listed in section 111.1 as examples of "steps a broker should take . . . to exercise

responsible supervision and control," but notes that by its terms the list in section 111.1

is non-exclusive and the regulation "in no way suggest that engaging in any one of the

steps or that any one factor would preclude a finding by Customs that a broker failed to

engage in responsible supervision and control. (Id.) Customs's interpretation of section 111.1 is grounded in the plain text of the regulation. Section 111.1 states that "[w]hile the determination of what is necessary to perform and maintain responsible supervision will vary depending upon the circumstances in each instance, factors which Customs will consider include, but are not limited to . . . [listing the factors]." 19 C.F.R. § 111.1 (emphasis added). Thus, Customs argues that the listed factors are not exhaustive and are written disjunctively. (Pl. Post-Trial Br. 21.) Consequently, "there [is] no need to find deficiencies in each and every [factor listed in section 111.1] prior to concluding that a broker had failed to exercise responsible supervision and control." (Id.) The plain text of the regulation allows Customs to consider factors not listed in section 111.1. Further, the regulation makes clear that Customs may weigh factors as it deems reasonably fit.

UPS insists, however, that use of the words "will consider" means that Customs must consider each of the factors. (Def.'s Post-Trial Br. 14-15.) However, where a rule states that an agency "will consider"[23] certain factors, this textual directive "implies wide areas of judgment and therefore discretion." Carolina Tobacco Co., v. Bureau of Customs & Border Protection, 402 F.3d 1345, 1350 (Fed. Cir. 2005) (citing Sec'y of Agric. v. Cent. Roig Refining Co., 338 U.S. 604, 611-14 (1950)) (internal brackets and quotes

---

[23]The word "will" when used as a verb can be used to express capability or sufficiency, see, e.g., WEBSTER'S THIRD NEW INT'L DICTIONARY 2616 (1986), whereas "shall" is used to express a command or exhortation. Id. at 2085-86.

omitted) ("In considering the [regulation] factors, the port director may give them whatever weight he deems appropriate; he may conclude that particular factors should be given no weight whatsoever."). Therefore, the Court holds that Customs was not required to weigh each factor listed in section 111.1 when evaluating whether UPS failed to exercise responsible supervision and control.

Customs presented a holistic, totality-of-the-circumstances application of section 111.1 to UPS's persistent misclassification violations where no single listed factor dominated. (Pl.'s Post-Trial Br. 16-22.) At trial, Customs presented evidence demonstrating that Customs worked with the brokerage community since the mid-1990s to improve compliance regarding classification, specifically, merchandise entered under HTSUS 8473.30.9000. UPS, as a licensed customs broker and ECO, was fully on notice about the importance of accurate classifications under 30.90 since at least late 1997. (Exs. 113 at 95, 107 at 111.) Customs conducted training programs with UPS, specifically addressing 30.90. (Tr. 867.) Customs also sponsored instruction courses, distributed education materials, held informal discussions and organized telephone conferences. (Ex. 107.) When UPS's compliance did not improve materially—defined by Customs officials as achieving a 95% compliance rate in the use of heading 8473—Customs issued warning letters and Notices of Action, which stated that continued improper use of 30.90 would be viewed as a significant violation that may result in monetary penalties. (Exs. 90-98; Tr. 914-16.) Notwithstanding Customs's

remedial training and extensive warnings, UPS continued to submit misclassified entries under 30.90 and did not satisfactorily improve its compliance rates under 30.90. To wit, in 1999, the tariff number 30.90 continued to appear on UPS prepared customs entry papers despite its prophylactic removal of that number from the tariff tape. (Tr. 604-12.) Further, between January 10 and May 10, 2000, Customs discovered no less than 57 misclassified entries improperly classified under 30.90. (Exs. 1-18, 20-44, 47-59.) It is clear from the facts found at trial that UPS failed to successfully stem the cascade of errors that resulted from supervisory neglect. (Tr. 509-10, 608, 612, 656, 689.)

UPS asserts that it did in fact exercise "responsible supervision and control" over its brokerage business, Def.'s Post-Trial Br. 8-9, and advances two defenses. First, that UPS's compliance rate for computer parts was higher than the national average; and second, that it responsibly and actively responded to the various Customs warnings in a manner befitting a responsible broker. (Def.'s Post-Trial Br. 7-8.) UPS correctly notes that, among the many factors Customs will consider in its determination of responsible supervision, section 111.1 includes "the volume of type of business of the broker" and "the reject rate for various customs transactions." 19 C.F.R. § 111.1. UPS submitted statistical evidence bearing down on the "volume" and "reject rate" factors. For example, during the period from January to May 2000, UPS made 2,900–3,900 Customs entries per day, for a total of approximately 375,000 entries. (Tr. 569-70.) Also, in 1998, UPS's compliance rate for computer parts under heading 8473 was 80%, a rate 15%

higher than the national average (65%) by all ECOs that year. (Exs. 113, AA; Tr. 202.)

Moreover, this rate was a vast improvement over UPS's 1997 compliance rate, which

was 59%. (Exs. Z, AA, M; Tr. 201-205.) UPS concludes that these statistical measures

demonstrate two points in their favor. First, concerning the "reject rate," UPS states

that Customs merely identified 42 misclassified entries using 30.90 out of 375,000 total

entries during the relevant period, amounting to "less than 2/100ths of one percent,"

hardly a significant breach. (Def.'s Post-Trial Br. 12-13.) Second, the net effect of

Customs's intense focus on the small number of misclassifications, here 42 entries, and

failing to compare this number against a whole deprives any meaning from the term

"reject rate"as such an analysis treats the 42 misclassifications in isolation, creating an

error rate of 100%. (Id. at 13 n.5.) Thus, UPS argues, in order for this particular section

111.1 factor to have any meaning, its failures here need to be viewed against "a

meaningful universe of Customs entries." (Id. at 12-13.) Customs did not address

UPS's specific arguments concerning the "reject rate."

As noted above, this Court defers to Customs's reasonable interpretation of its

own regulations. See So. Cal. Edison Co. v. United States, 226 F.3d 1349, 1356-57 (Fed.

Cir. 2000); Auer v. Robbins, 519 U.S. 452, 461-62 (1997). Customs has determined that

the section 111.1 factors are not exclusive, but serve as guidance to the agency and the

brokerage community. (See Tr. 889, 984-91; Pl.'s Post Trial Br. 16-22.) Customs, in the

exercise of its lawful discretion, may consider the listed factors in section 111.1 or look

beyond the factors and consider the totality of the circumstances, on a case-by-case basis as it did in this matter. See 19 C.F.R. § 111.1 ("While the determination of what is necessary to perform and maintain responsible supervision will vary depending upon the circumstances in each instance, factors which Customs will consider include, but are not limited to . . . [listing the factors].") (emphasis added); (Pl. Post-Trial Br. 21-22.). Accordingly, this Court finds UPS's arguments on this point untenable because they place sole reliance upon the reject rate and disregard the totality of the facts and circumstances at issue here. Further, UPS's preferred interpretation of section 111.1 is unduly restrictive and not in accord with Customs's interpretation of its regulation.

Concerning UPS's second defense—that it responsibly and actively responded to the various Customs warnings in a manner befitting a responsible broker—is mere ipse dixit. It is true that UPS submitted unchallenged evidence that it attended Customs's training sessions and conducted extensive training programs (Tr. 867, Findings of Fact ("FF") ¶¶ 11, 15, 17, 18, 27, 30), that it removed, at least initially, 30.90 from its tariff tape[24] (Tr. 612-13, 719-20; FF ¶¶ 22-25, 31), that it had a practice of warehousing merchandise in a "hold" area of its facilities when there was insufficient customs entry

---

[24]That UPS argues that it was under no legal obligation to remove 30.90 from its tariff tape (and thus going above the call of duty) (see Tr.612-13, 719-20) misses the point. Once UPS made the institutional decision to rely on this technology as its chosen remedy to foster compliance (along with training), it had a responsibility to ensure that it maintained and supported this measure so that there would be no further lapse or error, for as long as it was employed. (See Tr. 603-08; Exs. I, CC.) This is basic follow-through, which would seem to be a hallmark of supervisory competence.

documentation (Tr. 599), and that it tended to work out troublesome issues with

Customs by way of a partnership relationship (Tr. 534; FF ¶¶ 3, 33). In addition,

testimony of two Customs employees was elicited on cross-examination acknowledging

that UPS did perform some "responsible steps." (See Def.'s Post-Trial Br. 21-22; Tr. 192-

93, 379-80, 384.) In the final analysis, however, none of these activities or practices

ceased UPS's erroneous use of 30.90. The bottom line is that UPS fell down on the job in

this instance because it failed to effectively correct the oft-repeated misclassification

errors under 30.90, in accordance with its responsibilities as a customs broker under 19

U.S.C. § 1641(b)(4).

Consequently, this Court holds that UPS's continued failure to remedy its

shortcomings in 30.90 compliance after several years of identification, instruction, and

warnings by Customs, demonstrates by a preponderance of the evidence that UPS

failed to exercise the control and supervision necessary to reasonably conduct its

customs business.

C.     *A Single Violation or Multiple Violations of 19 U.S.C. § 1641(b)(4)?*

The penultimate issue that this Court must resolve is whether UPS's violation of

section 1641(b)(4) consisted of a single violation, as UPS contends, or multiple

violations, as advanced by Customs. (Pl.'s Post Trial Br. 23-24; Def.'s Post Trial Br. 24-

29.)

UPS argues that Customs's theory of the case centers on its characterization of UPS's repeated acts of misclassification as a pattern of conduct, and that it was the overall pattern of conduct and not any particular instance of misclassification that violated 19 U.S.C. § 1641(b)(4). (See Tr. 62, 1023, & 992 (associating UPS's conduct as a "pattern").) Because Customs had already charged a violation of 19 U.S.C. § 1641(b)(4) based on the same pattern of conduct (though different instances of misclassification), and UPS paid the associated $15,000 in fines, UPS argues that it has already satisfied its penalty obligation. (See Def.'s Post Trial Br. 25; note 7, supra.) UPS further complains that FP&F's "plan" of grouping together five misclassified entries and constructing a pre-penalty notice of $5000 per five entries (and later at $10,000 per five entries) "creates a classic multiplicity problem."[25] (Id. at n.15; see also Tr. 62, 1023, 992, 893.)

Customs maintains that each misclassified entry constitutes a "separate and distinct violation" of the broker statute. (Pl.'s Post Trial Br. 23-24.) Customs relies on its principle witness, Ms. Goldsmith, a Supervisory Import Specialist at Customs, to elucidate this argument. Ms. Goldsmith testified that each shipment of merchandise at

---

[25]UPS cites the following in support of its multiplicity argument: United States v. Stewart, 420 F.3d 1007, 1012 (9th Cir. 2005) ("[a]n indictment is multiplicitous when it charges multiple counts for a single offense, producing two penalties for one crime"); United States v. Holmes, 44 F.3d 1150, 1153-56 (2d Cir. 1995) ("A multiplicitous indictment . . . is one that charges in separate counts two or more crimes, when in fact and law, only one crime has been committed."); and Rutledge v. United States, 517 U.S. 292, 297 (1996) ("where two statutory provisions proscribe the same offense, a legislature does not intend to impose two punishments for that offense") (quotation and citation omitted).

issue here is a discreet event comprised of different merchandise from unique importers. Thus, "[e]ach time [an entry] is done . . . incorrectly, it is one violation . . . each one [entry] is a separate distinct incident by itself." (Id. at 24; see Tr. 904-05.) The predicate fact for how each entry constitutes an additional violation of the broker statute is, as Customs argues, UPS's "unwillingness to correct its persistent misclassification of the subject merchandise." (Id.)

While it is correct, as UPS concedes, that the text of section 1641(b)(4) addresses a broader concept and "does not speak in terms of individual entries being a violation" of section 1641(b)(4), (see Def.'s Post Trial Br. 25; cf. Pl.'s Post Trial Br. 23-24), this Court finds that, once again, this issue boils down to a matter of deference.

In promulgating the broker penalty regulations, which were subject to notice and comment, 50 Fed. Reg. 31,871 (Aug. 7, 1985), Customs had adopted the position that in assessing whether a broker has violated section 1641(b)(4), it reserved for itself a degree of discretion. Section 111.1 explicitly states that "the determination of what is necessary to perform and maintain responsible supervision and control will vary depending upon the circumstances in each instance." 19 C.F.R. § 111.1 (emphasis added). Customs also listed several factors that the agency "will consider . . . but [is] not limited to." Thus, Customs institutionally decided not to enumerate the entire catalogue of circumstances and indicia of "responsible supervision and control." Moreover, Customs has the inherit discretion to weigh the regulatory factors or consider each situation on a case-

by-case basis. Cf. Cent. Roig Refining Co., 338 U.S. at 611-14 ("In considering the

[regulation's] factors, the port director may give them whatever weight he deems

appropriate; he may conclude that particular factors should be given no weight

whatsoever."); Carolina Tobacco Co., 402 F.3d at 1350.

As such, UPS's over-reliance on Customs's trial counsel's discrete reference to

UPS's actions in this case as a "pattern" (presumably resulting in one continuing wrong

as opposed to a series of discrete wrongs) is misplaced. Moreover, Customs's fleeting

reference to a "pattern" of conduct merely provides background for the specific

allegations contained in the Complaint, but does not allege a substantive violation of

section 1641 creating a multiplicity problem.[26] The underlying failure by UPS under

section 1641(b)(4) is its failure to correct repeated misclassifications of merchandise

---

[26]In addition, UPS's concern over a "multiplicity problem" is inapposite here. "Multiplicity is charging a single offense in several counts." 1A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE, CRIMINAL 3D § 142 (2004). "The danger presented by multiplicitous charges is that the defendant will be punished more than once for a single crime, offending the Double Jeopardy Clause of the Constitution." United States v. Cassano, 372 F.3d 868, 881 (7th Cir. 2004), judgment vacated on other grounds, 543 U.S. 1109 (2005). Here, UPS was not being targeted by Customs multiple times for the same offense. A series of misclassified entries was each determined by Customs to be a separate violation of section 1641(b)(4) in light of the totality of the circumstances addressed in this opinion. Moreover, it is doubtful that the doctrine of multiplicity is applicable to civil or administrative matters. See Hudson v. United States, 522 U.S. 93, 99 (1997) ("The Clause protects only against the imposition of multiple criminal punishments for the same offense.") (emphasis in original); see also United States ex rel. Marcus v. Hess, 317 U.S. 537, 548-49 (1943) ("Only [criminal punishment] subject[s] the defendant to 'jeopardy' within the constitutional meaning"). Should such a doctrine be found to apply to the broker statute, that directive must come from the legislative branch.

under 30.90, given the attention Customs had given to the issue and asked of UPS. Additional misclassifications meant that the company continued to fail in exercising responsible supervision and control. To hold that Customs is limited to issuing only one penalty in instances like this one where the defendant continually engages in the same conduct would hamper Customs's enforcement authority, and read a restriction into 19 U.S.C. § 1641 that does not exist. See UPS I, 30 CIT at __, 442 F. Supp. 2d at 1309 ("[n]either the broker penalty statute nor Customs regulations place any temporal [or numerical] restriction on a penalty issued by Customs"). As a result, this Court holds that Customs established that UPS violated section 1641 on multiple occasions, as encompassed in each of the five penalty actions brought against UPS, and not just a single violation.

### D. *The Assessed Penalty*

Finally, the Court concludes, on the record before it, Customs has established, by a preponderance of the evidence, that UPS failed on multiple occasions to "exercise responsible supervision and control" over its "customs business." 19 U.S.C. § 1641(b)(4); 19 C.F.R. § 111.1. UPS misclassified at least 42 entries between January 10 and May 10, 2000, by improperly using tariff subheading HTSUS 8473.30.9000, despite repeated warnings and remedial instruction by Customs not to do so. UPS had adequate notice of the penalties arrayed against it, and had a full and fair opportunity to be heard. Therefore, based on the relevant law and the totality of the factual

circumstances presented here before the Court, penalties are warranted. See Ricci, 985

F. Supp. at 127; cf. UPS I, 442 F. Supp. 2d at 1309 ("Customs may penalize a broker 'a

maximum of $30,000 for any violation or violations of the statute in any one penalty

notice.'") (citing 19 C.F.R. Pt. 171, App. C., XII(A)) (emphasis added).

This Court adopts the penalties as calculated and imposed by Customs, see 19

U.S.C. § 1641(d)(1)(C) and 19 C.F.R. Pt. 171, App. C., XI & XII(A), and finds the same fair

and reasonable in the following amounts: $5,000 (penalty action no. 2000-4196-300221);

$5,000 (penalty action no. 2000-4196-300222); $5,000 (penalty action no. 2000-4196-

300223); $30,000 (penalty action no. 2000-4196-300319); and $30,000 (penalty action no.

2000-4196-300320), for a total of $75,000.

### VI. Conclusion

This Court holds that: (1) UPS misclassified certain merchandise under subheading HTSUS 8473.30.9000; (2) its misclassification under the facts and circumstances demonstrated at trial amounted to multiple violations of 19 U.S.C. § 1641, which requires brokers to "exercise responsible supervision and control" over their customs business; and (3) Customs is entitled to a judgment in the amount of $75,000 against UPS, plus any applicable interest that may be due.

A separate Judgment of the Court will be issued in conjunction and in accordance with this Opinion.

/s/ Gregory W. Carman
Gregory W. Carman

Dated:    May 28, 2008
          New York, New York